Lester Leroy **BOWER**, Jr., Appellant,

v.

The **STATE** of Texas, Appellee.

Nos. 69333–69336.

Court of Criminal Appeals of Texas, En Banc.

Jan. 25, 1989.

Rehearing Denied March 1, 1989.

Certiorari Denied July 3, 1989.
See 109 S.Ct. 3266.

E.X. Martin, John H. Hagler, Dallas, for appellant.

Stephen Davidchik, Dist. Atty., and Kellis W. Sampson, Asst. Dist. Atty., Sherman, Robert Huttash, State's Atty., Austin, for the State.

## OPINION

McCORMICK, Presiding Judge.

Appellant was convicted of four capital murders after a joint trial. Punishment in each case was assessed at death. Appellant has raised the same twelve points of error in each case and, for that reason, all four cases will be considered together.

Testimony at trial showed that one of the victims, Bobby Glen Tate, owned the B & B Ranch which was located near Sherman. Mr. Tate owned an ultra light aircraft which he stored in a hangar located on his property. Another ultra light aircraft owned by David Brady was also stored in the hangar. Evidence was presented to show that Tate had decided to put his ultra light up for sale and his friend, Philip Good, another one of the victims, who sold ultra lights was attempting to find a buyer for the aircraft. A day or two before the commission of the offense, Tate told his wife, Bobbi, that Philip Good had met someone the previous Wednesday who was interested in buying the ultra light.

On October 8, 1983, Mr. Tate went out to his ranch to work on a house he was building. According to Bobbi Tate, he was to return to their home in town around 4:30 p.m. About 7:30 p.m., when he failed to return, Bobbi and her stepson, Bobby Jr., went to the ranch. Outside of the hangar, they saw vehicles belonging to Tate, Philip Good and Ronald Mays. However, the hangar was locked and no lights were showing through the windows. Bobbi retrieved a key from her husband's pickup and unlocked the hangar door. Upon opening the door, they saw the body of Ronald Mays lying in a pool of blood. Bobbi and Bobby, Jr. went to the nearest phone and called police.

Marlene Good, the widow of Philip Good, reiterated a similar story. She testified that on September 30, 1983, someone called their home and spoke with Philip for ten or fifteen minutes regarding an advertisement Philip had placed in "Glider Rider" magazine regarding the sale of an ultra light. Philip told the caller that he had sold the ultra light advertised in the magazine, but he had another that he could sell. On the following Monday or Tuesday, the man called again. On Wednesday, October 5, Philip met the man at the Holiday Inn in Sherman and took him out to the B & B Ranch in order to show him Bob Tate's ultra light. When Philip returned at about 4:00 p.m., he told Marlene that he thought he had sold Bob Tate's ultra light and the man was going to pick up the plane on Saturday, October 8. On October 8, Marlene testified that she spent the day with Ronald Mays' wife. Philip spent the day helping Jerry Brown build an ultra light in Philip's hangar. At 3:30 p.m., Philip called her and told her he was going to meet the man at the hangar on the B & B Ranch at 4:00 p.m. At approximately 4:30 p.m., Ronald Mays left to go the hangar at the ranch. When he had not returned by 6:30 p.m., Marlene went to the hangar to see

what was happening. When she arrived, she too saw all the vehicles parked outside. The door to the hangar was locked and when she looked into the hangar windows, she could see that Bob Tate's ultra light was missing. Seeing that no one was around, she went home.

When investigators arrived on the scene, they discovered a grisly sight. Immediately inside the door of the hangar, they found the body of Ronald Mays. Underneath a pile of carpeting, investigators found the bodies of Philip Good, Bobby Tate, and Jerry Mack Brown. Good, Tate, and Brown had each been shot twice in the head. Mays had been shot once in the head, once in the neck, once in the right arm and once in the right side of the chest, and once in the back of the chest. All of the victims still had their wallets and their jewelry. Tate's ultra light which had been in the hangar earlier in the day was missing. A table situated against one wall of the hangar had a large spot of blood on it. Tests showed that this blood matched a sample of blood taken from Tate's body during an autopsy. This, plus the placement of the bodies underneath the carpet, led investigators to speculate that Tate had been shot while sitting at the table and then had been dragged over and placed with the bodies of Brown and Good. Investigators also found eleven spent .22 caliber shell casings which had been manufactured by Julio Fiocci. The scattered arrangement of the casings on the floor of the hangar indicated that the killer had used an automatic weapon rather than a revolver, since an automatic ejects the cartridges after each shot.

Dr. Charles Petty performed autopsies on the victims. According to Dr. Petty, three of the victims, Good, Brown and Tate all sustained two gunshot wounds to the head. In the cases of Good and Tate, both men had one contact wound. On the other hand, both of Brown's wounds were contact wounds. Mays sustained one contact wound to the head and four other wounds to the upper part of his body. Dr. Petty

further testified that the presence of the contact wounds indicated that when the weapon was fired, the muzzle of the gun was placed directly against the victim's head. In addition, the gunpowder residue left on the victims indicated that in each instance the murder weapon was equipped with a silencer. Dr. Petty testified that he removed eleven bullets and fragments from the victims. All of the bullets appeared to be .22 caliber hollow point bullets.

Larry Fletcher, a firearms examiner with the Dallas County Institute of Forensic Sciences, testified that tests run on both the spent casings and the bullets indicated that the shots were fired from either an AR–7 .22 caliber rifle, a Ruger .22 caliber semi-automatic pistol, or a High Standard .22 caliber semi-automatic pistol. Markings on the bullets indicated that a silencer was used. In addition the ammunition was manufactured by Julio Fiocchi and was A-sonic (traveled at speeds below the speed of sound) and had hollow points. Fletcher testified that A-sonic ammunition had the characteristic of reducing the noise discharge normally heard upon the firing of a weapon. Fletcher also testified that Julio Fiocchi ammunition was unique in that in his nine years as a firearms examiner, he had never encountered it before. Due to the condition of the bullets, Fletcher could positively say that only two of the bullets were fired from the same weapon. One of these bullets was extracted from the body of Mr. Mays and one from the body of Mr. Tate.

Much of Fletcher's testimony was duplicated by the testimony of Paul Schrecker, a firearms examiner with the FBI. Schrecker testified that all eleven casings were fired from a single weapon, and the markings on the casings were all consistent with a Ruger firearm. His examination of the bullets indicated that at least seven of the bullets were fired by the same weapon. He agreed with Fletcher that a silencer was used. As far as the type of ammunition used, Schrecker testified that he had

never encountered Fiocchi .22 caliber long rifle ammunition before this case.

Dennis Payne, appellant's supervisor at Thompson–Hayward Chemical Company in Dallas, testified that appellant had worked for the company in Colorado until he was laid off in February of 1983. Then in May of 1983, Payne had hired him for a sales position in Dallas. Although appellant's job performance in Colorado had been excellent, his performance in Dallas was poor.

While working in Dallas, appellant had been assigned a telephone credit card. A review of the record of the Thompson–Hayward Chemical phone bills indicated that on Friday, September 30, a call was made and charged to appellant's company credit card. This call was made to Philip Good's residence and the conversation lasted ten minutes. A direct dial call was made to Philip Good's residence again on Monday, October 3. This was a two minute call. Another call was placed on appellant's credit card to Philip Good's residence on Friday, October 7. This call lasted three minutes.

Another one of appellant's coworkers, Randal Cordial, testified that prior to the company sales meeting on January 3, 1984, appellant told him that he was building an ultra light airplane and lacked only the engine.

FBI Special Agent Nile Duke testified that after they traced the above-mentioned phone calls to the Thompson–Hayward Chemical Company, he began interviewing all the employees of the company in hopes of finding out who had placed the calls. After learning that appellant had told Special Agent Jim Knight that he had telephoned Philip Good, he scheduled an interview with appellant on January 11, 1984 at the company office. During the two hour interview, appellant told Duke that he had seen an advertisement in Glider Rider Magazine regarding an ultra light aircraft that Good had for sale. Appellant admitted calling the Good residence twice. According to appellant, during the first call which he said was the shortest, he had spoken only with Mrs. Good who told him that Mr.

Good was not at home. He later called back and spoke with Mr. Good who informed him that the ultra light had been sold. Appellant told Duke that he had made only two calls and none of the calls had been placed on company credit cards. Appellant also told Duke that he had never made an appointment to see Good and had only passed through Sherman on his way to Tulsa or Gainesville. When asked his whereabouts on the day of the murders, appellant told Duke that he could not account for his whereabouts on October 8, although he did remember that he was sick with a virus on Monday, October 10 and had stayed home from work. Finally Duke testified that appellant admitted he owned a .300 Winchester Magnum rifle, a Remington 1100 shotgun, a Savage Model B side-by-side double barrel shotgun, a Ruger 277V .220 caliber rifle, a 6.5 caliber Japanese rifle, a Winchester bolt action .22 caliber rifle, a Marlin lever action .4570 caliber government rifle, a .243 caliber Remington 700 rifle, and a .20—Model 929 Smith and Wesson .44 caliber Magnum revolver. Appellant also told Duke that he had previously owned a .357 caliber revolver. When asked specifically about a .22 caliber handgun, appellant replied that he did not own one.

On January 13, 1984, appellant went to the FBI office in Dallas to take a lie detector test. After talking with the agents there, appellant decided not to take the test. According to FBI agent William Teigen, at that point all the authorities knew about appellant was that he was employed at Thompson–Hayward, that three telephone calls had been made on the company phone bill to Philip Good's residence and that he was interested in ultra lights. Appellant stayed and talked with the FBI agents some four hours. During this conversation, appellant admitted that he had made the calls but that he decided not to buy the ultra light from Good and never had any further contact with him. Appellant also told the agents of his interest in ultra lights. Appellant related to the agents how he had spent hours researching

ultra lights and how he hoped someday to build an ultra light. Appellant went on to tell the agents that he had already obtained a piece of fabric for the covering, a fiberglass boat seat and some aircraft aluminum. Teigen testified at trial that after talking with appellant he believed that appellant was more than obsessed with the aircraft. When asked specific questions by the agents, appellant said that he had never bought an ultra light, that he had not been in Sherman on the day of the murders, that he had not met Philip Good on the day of the murders and had never met him in person, that he did not know where the missing ultra light was, and that he had never seen the missing ultra light.

After further investigation, a search warrant was obtained for appellant's residence. The search was conducted during the evening of January 20, 1984. Among the items seized were various manuals and magazines which were introduced into evidence at trial: a manual on the Cuyuna ultra light aircraft engine, a magazine entitled *Glider Rider's Magazine* which showed appellant as a subscriber, the *World Guide to Gun Parts*, the *Instruction Manual for Ruger Standard Model .22 Automatic Pistols,* Vol. II of *Firearm Silencer Manual,* two Xeroxed pages from *Shotgun News* depicting silencers and silencer weapons, *The AR–7 Exotic Weapons System Book,* a manual on explosives entitled *High–Low Boom! Modern Explosives,* another manual entitled *Semi–Full Auto, AR–15 Modification Manual,* another weapons manual entitled *Rhodesian Leaders Guide,* and several catalogs containing ads for military equipment including guns, clothing and numerous publications including books on how to kill. Authorities also found a form letter address to "Dear Customer" from Catawba Enterprises, indicating that appellant had purchased an item from the company. Authorities also found inside a briefcase which was located inside appellant's garage an Allen wrench which could be used to mount a Catawba silencer to a pistol and a packet of materials which included among other things appellant's Federal Firearms Licenses which permitted him to sell firearms, ammunition and other destructive devices. Appellant's own Firearms–Acquisition and Disposition Record which was also seized during the search indicated that he bought a Ruger RST–6–automatic .22 pistol, serial number 17–28022 on February 12, 1982 and sold it to himself on March 1, 1982. Investigation showed that on February 12, 1982, appellant also ordered three boxes of Julio Fiocchi .22 ammunition. Perhaps most incriminating were the parts of the ultra light found during the search. In the garage were two ultra light tires and rims with the name "Tate" scratched in each rim. Another ultra light tire and rim were found in appellant's house. Six pieces of aluminum ultra light tubing were found in the garage. Wadded up on top of a box in the garage were warning stickers that had been removed from the aluminum tubing of an ultra light. In addition, an ultra light harness was found in the house and a fiberglass boat seat was found in the garage. Authorities also removed a pair of rubber boots and a blue nylon bag from appellant's garage after noticing what appeared to be blood stains on these items. Also removed was a sledge hammer and some ashlike debris taken from the trunk of appellant's car.

Scientific evidence presented at trial showed that a fingerprint belonging to one of the victims, Jerry Mack Brown, was found on one of the pieces of ultra light tubing found in appellant's garage. In addition, an analysis of the sledge hammer removed from appellant's garage showed that material present on one side of its head was polypropylene, the same material which was used to make the American Aerolight decals. Metallic smears present on the other side of its head tested out to be of the same type of aluminum alloy as was used to make the Cuyuna engine, the reduction unit for a Cuyuna engine, the crank case and the carburetor used in ultra light aircraft. An analysis of the material taken from the trunk of appellant's car also revealed a fragment of this same aluminum

alloy. A forensic metallurgist with the FBI determined that this metal fragment was once a portion of a reduction unit for an ultra light engine and it appeared that the reduction unit was fragmented by a smashing action, consistent with a blow from a sledge hammer. Also found in the debris from the trunk of appellant's car were fragments of an American Aerolights decal. Tests on the boots removed from the garage showed the presence of human blood on the right boot but an attempt to type the blood was inconclusive. Tests on the blue nylon bag found in appellant's garage also indicated the presence of human blood.

Other testimony was presented to show that Catawba Enterprises dealt primarily in silencer parts and that the Catawba silencer could be easily installed on a Ruger RST–6 semi-automatic .22 pistol with an Allen wrench. Ed Waters, the attorney for Catawba Enterprises testified that ninety-nine per cent of the company's business was selling silencers and thus if appellant had one of the company's form letters acknowledging a transaction, appellant had probably purchased a silencer from the company.

Sandy Brygider, the owner of Bingham Limited, the sole distributor of Julio Fiocchi ammunition in the United States testified that the .22 sub-sonic Fiocchi ammunition was not sold over the counter but rather was a specialty item used primarily for suppressed weapons. Brygider testified that in the previous three years, his company had sold Fiocchi ammunition to only ten or fifteen dealers in Texas. He further testified that his company records showed that they had shipped three boxes of Fiocchi .22 long rifle sub-sonic hollow point ammunition to appellant on February 12, 1982 and five more boxes on December 10, 1982.

Lori Grennan, the customer service coordinator for American Aerolights, testified that her company manufactured the ultra light owned by Bob Tate. She testified that it was possible for the aircraft to be broken down and put into a thirteen foot carrying case and carried by one person. Grennan also testified that every ultra light manufactured by her company bears three company decals, two on one of the pieces of tubing and one on the engine. However, after examining the tubing removed from appellant's garage, she noted that these stickers decals were not present. She also testified that every ultra light has certain warning stickers. When shown the wadded up stickers found on the box in appellant's garage, Grennan testified that those were the warning stickers that would go on the ultra light manufactured by her company. Finally, Grennan testified that the harness and tire rims found in appellant's garage came from an ultra light manufactured by American Aerolights.

Marjorie Carr, the owner of a fruit stand in Sherman, testified that she had seen appellant in the company of Philip Good in Sherman in late September of 1983. According to Carr, Good and appellant had come into her stand and appellant was interested in buying some oranges. Carr related that she spoke with appellant for some ten or fifteen minutes and she remembered appellant telling her that he had moved from Colorado several months earlier and was then living in Dallas.

Further testimony showed that appellant had gone to the Arlington Sportsman's Club on September 30, 1983 and had spent fifteen minutes firing .22 ammunition.

During the defense case-in-chief, appellant presented several witnesses who testified that appellant's reputation for being a peaceful and law-abiding citizen was good. Evidence was also presented to show that although appellant had bought a Ruger RST–6 semiautomatic .22 pistol in 1982, he had lost it in the mountains of Colorado while backpacking alone in August of 1982. Finally, appellant's wife testified that on the morning of the offense, appellant left their home around 6:30 a.m. to go bow hunting. He returned home around 6:30 p.m.

■ In appellant's third point of error, he argues that the evidence is insufficient

to support his conviction. Appellant contends that the evidence against him amounts to nothing more than a strong suspicion that he committed the crime, or a mere probability that he did so.

In both circumstantial and direct evidence cases the standard by which evidence is reviewed is whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Houston v. State,* 663 S.W.2d 455 (Tex.Cr.App.1984); *Carlson v. State,* 654 S.W.2d 444 (Tex.Cr.App.1983). Furthermore, the evidence must be viewed in the light most favorable to the verdict. *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *Burks v. State,* 693 S.W.2d 932 (Tex.Cr.App.1985). After applying this standard of review to the instant case, we find the evidence sufficient to sustain the verdict.

The evidence showed that all four victims were shot with a .22 caliber pistol. Expert testimony indicated that they were shot with a pistol equipped with a silencer. Spent casings found at the scene of the crime were those of an extremely rare variety of ammunition. Appellant's purchases of this type of ammunition was proven. The evidence also established that appellant owned a pistol of the same model and make as the one thought to have been used in the killings. These factors combined with the presence in appellant's home of literature and paraphernalia associated with the construction and use of silencers point to appellant's guilt. Appellant's guilt was further buttressed by the discovery of the ultra light aircraft parts in his residence and the obvious attempts to destroy all identifying characteristics of the aircraft such as removing the decals and warning stickers and smashing the engine components. Finally, appellant's denial of first, ever calling Philip Good and then, of ever meeting with Philip Good and his denial to the FBI agents of having possession of any of the missing ultra light parts only a week prior to arrest are further substantiation of appellant's guilt. Viewing the evidence in the light most favorable to the verdict, we find the evidence to be sufficient to sustain the convictions. Appellant's third point of error is overruled.

■ In his tenth point of error, appellant argues that the evidence is insufficient to prove that the offense occurred while the appellant was in the course of committing or attempting to commit robbery. In his eleventh point of error, appellant argues that the evidence is insufficient to show that he committed the murders "in the course of committing theft." We will consider these points of error together. Appellant argues that since the State failed to prove that the recovered aircraft components were, in fact, the stolen ultra light, the State was unable to show first, the commission of the theft and second, that the murders were committed with the intent to obtain that property.

We begin our discussion by pointing out that the evidence presented at trial showed not just that the property found in appellant's garage was similar to the property taken during the offense, but when viewed in the light most favorable to the verdict showed that appellant was in possession of the same property taken during the offense. The presence of Jerry Mack Brown's fingerprint on one of the pieces of ultra light tubing, the ultra light wheels with the name "Tate" scratched on the rims, the evidence of the removal of the decals and warning stickers, and the evidence of the destruction of the engine components upon which identifying serial numbers had been placed all proved up the act of theft and appellant's accompanying intent. In addition, the evidence clearly showed that appellant was keenly interested in ultra lights. Finally, the missing ultra light was removed at the time of the murders. Mrs. Tate testified that the ultra light was in the hangar when she last saw her husband at 3:30 p.m. on the day of the offense but testimony of Marlene Good showed that the ultra light was missing when Mrs. Good looked in the window of the hangar at approximately 6:30 p.m. that evening.

As noted above, appellant was indicted in each case for capital murder pursuant to the provisions of V.T.C.A., Penal Code, Section 19.03(a)(2) which provide that a person commits the offense of capital murder if he intentionally commits murder in the course of committing or attempting to commit robbery. In *Riles v. State,* 595 S.W.2d 858 (Tex.Cr.App.1980), this Court construed the phrase "in the course of committing or attempting to commit" as used in Section 19.03(a)(2) as meaning:

> "conduct occurring in an attempt to commit, during the commission, or in immediate flight after the attempt or commission of the offense, i.e., in this case, of robbery."

See also *Autry v. State,* 626 S.W.2d 758 (Tex.Cr.App.1982). Because, after viewing the evidence in the light most favorable to the verdict, there is no other outstanding reasonable hypothesis, we find that the evidence is clearly sufficient to show that the killings occurred in the course of committing the robbery. *Russell v. State,* 665 S.W.2d 771 (Tex.Cr.App.1983); *Banks v. State,* 643 S.W.2d 129 (Tex.Cr.App.1982). *O'Pry v. State,* 642 S.W.2d 748 (Tex.Cr. App.1982) (Opinion on Rehearing). Appellant's tenth and eleventh points of error are overruled.

■ Appellant also complains that the evidence is insufficient to support an affirmative answer to the second special issue. At the punishment phase of the trial, the State produced no additional testimony. The defense presented testimony from family and friends of the appellant to the effect that appellant was not a violent person but was a good and generous person.

In determining the sufficiency of the evidence to support an affirmative answer to the second special issue, we may take into account the facts adduced during the guilt-innocence phase of the trial. *Moreno v. State,* 721 S.W.2d 295 (Tex.Cr.App.1986); *Hawkins v. State,* 660 S.W.2d 65 (Tex.Cr. App.1983); *Mitchell v. State,* 650 S.W.2d 801 (Tex.Cr.App.1983). The calculated nature of the defendant's act and the fore-thought with which he coldly planned and executed his crime is probative of his propensity to commit future acts of violence. *Moreno v. State,* supra; *O'Bryan v. State,* 591 S.W.2d 464 (Tex.Cr.App.1979).

We find that the facts of this brutal offense alone clearly support the jury's finding that appellant would commit acts of violence that constitute a continuing threat to society. This point of error is overruled.

In his next five points of error, appellant complains of the legality of the search of his residence. He initially contends in point of error number four that the ultra light components were illegally seized in that the affidavit upon which the search warrant was based did not contain probable cause. Specifically he urges first that there is no showing in the affidavit that the ultra light components would be located in his garage and second, the viewing of the ultra light parts in his garage on January 13, 1984, constituted an illegal search in and of itself and thus cannot be used in establishing probable cause.

■ We turn first to appellant's contention concerning the viewing of the ultra lights parts in appellant's garage on January 13, 1984. At the hearing on the motion to suppress, Texas Ranger Weldon Lucas testified that he and two FBI agents went to appellant's home on the evening of January 13 to further converse with him. When they pulled up to the house, Lucas noticed that the lights in the house were on while the attached garage was dark. Lucas told one of the agents to look into the garage to make sure that no one was in the garage while he went to knock on the front door. When the FBI agent looked into the garage door window, he saw the aluminum tubing lying on the garage floor.

Appellant relies principally on the case of *Kann v. State,* 694 S.W.2d 156 (Tex.App.— Dallas 1985, petition refused) to support his contention that the viewing of the ultra light parts constituted an illegal search. In *Kann,* a police officer got a tip from another police officer from another jurisdiction,

who had gotten a tip from an unnamed informer that a person named Merna was growing marihuana in her back yard on Towne House Street in Richardson. The officer looked through the city water log for the street in question and located the address of a Merna Kann. The officer went to Kann's house with the intent of finding marihuana growing there. The officer drove down the alley behind Kann's home and stopped at Kann's carport. She could not see the back yard because it was enclosed by a six foot high wooden privacy fence. The officer walked through the defendant's carport and by bending down near the fence she could see through a hole in the fence. Through the hole she saw marihuana growing in the back yard. After spotting the marihuana, the officer left the scene, prepared an affidavit outlining what she had seen and obtained a search warrant. On appeal Kann alleged that the officer's action in going into her carport and peering through her fence to see her back yard without a warrant constituted an illegal search and that through that search the officer obtained the essential information for her affidavit. As a result, Kann argued, since the search warrant was a product of the prior illegal search, the seizure of the evidence incidental to the execution of the search warrant was also illegal and should have been excluded. The Court of Appeals agreed with Kann. Because we find the Court of Appeals' summary of the law in this area to be excellent we quote extensively from its opinion:

"Since the decision in *Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), the following two-fold inquiry has been used to determine whether a search complies with the Fourth Amendment: (1) whether an individual, by his conduct, exhibits an actual, subjective expectation of privacy; and (2) whether that expectation of privacy is one that society is prepared to recognize as reasonable. *Oliver v. United States,* [466] U.S. [170], 104 S.Ct. 1735, 1740, 80 L.Ed.2d 214 (1984); *Smith v. Maryland,* 442 U.S. 735, 740–741, 99 S.Ct. 2577,

2580–2581, 61 L.Ed.2d 220 (1979). No single factor, however, determines whether an individual may legitimately claim, under the Fourth Amendment, that a place should be free from government intrusion not authorized by warrant. *Oliver v. United States,* 104 S.Ct. at 1741. The expectation of privacy test has, to an increasing extent, discarded fictional property concepts in resolving the issues of privacy and public security. *Texas v. Gonzales,* 388 F.2d 145, 148 (5th Cir.1968). Thus, the validity of a search does not turn on trespass law. *Maryland Penitentiary v. Hayden,* 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967). To violate the Fourth Amendment, there must be an actual intrusion into a constitutionally protected area. The distinction between open field and curtilage is of assistance in determining the existence or not of reasonable privacy expectations. *United States v. Williams,* 581 F.2d 451, 453 (5th Cir.1978).

"Curtilage is 'the land immediately surrounding and associated with the home' and warrants the same Fourth Amendment protections that attach to the home. *Oliver v. United States,* 104 S.Ct. at 1742; *accord, Gonzales v. State,* 588 S.W.2d 355, 360 (Tex.Cr.App.1979). On the other hand, no legitimate expectation of privacy extends to an open field, which may be defined as 'any unoccupied or underdeveloped area outside the curtilage' of a dwelling. *Hurwitz v. State,* 673 S.W.2d 347, 349 (Tex.Cr.App.1984) (quoting *Oliver v. United States* at 104 S.Ct. at 1742 and n. 11).

"Following the definition of curtilage set out in *Oliver,* we hold that the curtilage surrounding appellant's home encompassed her carport. *See Woodbury v. Beto,* 426 F.2d 923, 927 (5th Cir.1970). The carport was adjacent to appellant's back yard and was separated from it by only a fence with a gate in it. The fence blocked view of the back yard from the alley. Moreover, appellant owned the land on which the carport was situated and maintained control over the use of

the carport. She had personal belongings in the carport. Therefore, Officer Acord invaded appellant's curtilage when she crossed the carport to peer through a small hole in appellant's fence.

"Whenever government agents enter into the curtilage they necessarily intrude upon the individual's reasonable expectation of privacy. *United States v. Jackson,* 588 F.2d 1046, 1053 (5th Cir. 1979); *Williams,* 581 F.2d 451. Accordingly, 'warrantless searches are improper absent exigent circumstances, at least when the investigating officers have intruded upon the curtilage for the purpose of conducting a search for criminal activity.' *United States v. Williams,* 581 F.2d 451, 453 (5th Cir.1978); see also *United States v. Van Dyke,* 643 F.2d 992, 993 (4th Cir.1981); *United States v. Jackson,* 585 F.2d 653, 660 (4th Cir.1978) (dictum); *United States v. Davis,* 423 F.2d 974, 976–77 (5th Cir.), cert. denied, 400 U.S. 836, 91 S.Ct. 74, 27 L.Ed.2d 69 (1970)." 694 S.W.2d at 159–160.

We find *Kann* to be distinguishable from the instant case. The following language in Justice Howell's concurring opinion in *Kann* points out the distinction:

"... An officer or any other member of the public, is authorized by well established community custom, to enter premises by the indicated usual route for the purpose of knocking on the front door, but once he deviates from this purpose, the officer loses his status as an invitee. He has no right to be there and any search whatever becomes illegal ..." 694 S.W.2d at 161.

Clearly, as noted above, anyone, be it law enforcement officer or common citizen, has the right to approach appellant's front door. As it was stated in *Davis v. U.S.,* 327 F.2d 301, 303 (9th Cir.1964):

"Absent express orders from the person in possession against any possible trespass, there is no rule of private or public conduct which makes it illegal per se, or a condemned invasion of the person's right of privacy, for anyone openly

and peaceably, ..., to walk up the steps and knock on the front door of any man's 'castle' with the honest intent of asking questions of the occupant thereof—whether the questioner be a pollster, a salesman, or an officer of the law."

And in *Lorenzana v. Superior Court of Los Angeles County,* 9 Cal.3d 626, 108 Cal.Rptr. 585, 587, 511 P.2d 33, 35 (1973), this "exception" to the curtilage doctrine was described as follows:

"A sidewalk, pathway, common entrance or similar passageway offers an implied permission to the public to enter which necessarily negates any reasonable expectancy of privacy in regard to observations made there. The officer who walks upon such property so used by the public does not wear a blindfold; the property owner must reasonably expect him to observe all that is visible. In substance the owner has invited the public and the officer to look and to see. But, by the same reasoning, the officer who intrudes upon property not so open to the public enjoys no such perogatives."

The paramount question to be determined in the instant case is, was the act of looking into appellant's garage windows a violation of appellant's expectation of privacy. Clearly in *Kann,* the defendant's expectation of privacy was violated by the officer's encroachment on territory which had purposefully been fenced off and excluded from the public eye. This is not the situation in the instant case. The officers approached appellant's front door by the only means of access—the driveway. The windows of appellant's garage were not curtained but rather open to public inspection. The officer's did not deviate from the public pathway. Clearly, unlike *Kann,* there was no violation of appellant's expectation of privacy. What a person knowingly exposes to the public, even in his own home, is not a subject of Fourth Amendment protection. *Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967); *Rodriguez v. State,* 653 S.W.2d 305 (Tex.Cr.App.1983). The viewing of the ul-

tra light parts in appellant's garage was not a search.

A review of other cases involving similar fact situations indicates that our resolution of the issue is correct. In *Long v. State*, 532 S.W.2d 591 (Tex.Cr.App.1975), a sheriff and deputy had gone to a house on rural property in Wise County to inquire about suspicious aircraft flights from the property. They knocked on the door facing the carport and received no response. They proceeded around the house to the back door of the house and knocked again. Once again there was no answer. They continued around the house to return to the car. Through an open uncurtained window they felt a blast of heat, detected a strong marihuana odor, and saw a fan and heater and a substance, later identified as marijuana, covering the floor and stacked around the walls. The Court found that this observation did not constitute a search since the area was open to public view.

The case of *Potter v. State*, 481 S.W.2d 101 (Tex.Cr.App.1972) also involved officers looking into a garage door window. In *Potter*, officers suspected Potter of improperly registering cars and being involved with stolen vehicles. During surveillance of Potter's house, an officer saw Potter and another individual drive up in a car which was improperly registered. Due to his position, the officer was unable to see if either Potter or his passenger entered the house. Two officers went to the front door of Potter's home in order to talk with him about the car parked in his driveway. When they knocked on the front door, there was no response. The officers heard a door slam and while one officer went to the rear of the house to investigate, the other officer walked to the side of the house, looking into the windows for someone to whom he could speak. Looking through the window on the garage door, he observed another vehicle. After radioing in the description and license plate number of that car, he received a report that it was stolen. The officers contacted Potter's wife at her place of employment and she gave them consent to search the premises. On appeal, Potter argued that the officer committed an illegal search by looking into the garage window. This Court disagreed.

In *Johnson v. State*, 469 S.W.2d 581 (Tex.Cr.App.1971), the police acting on an anonymous tip went to the defendant's apartment. They knocked on the door, and when no one answered, they looked into a window through a two inch gap between partially drawn draperies, and saw what appeared to be stolen merchandise. A search warrant was obtained on the basis of this observation. This Court rejected the contention that the window observation was a search by finding that the defendants could not "reasonably assume that they were free from uninvited inspection through the window." See also *Palmer v. State*, 475 S.W.2d 797 (Tex.Cr.App.1972).

Other jurisdictions have also approved similar plain view situations: *People v. McGahey*, 179 Colo. 401, 500 P.2d 977 (1972) (Officer drove into driveway to investigate a tip that the defendant had marihuana plants in his picture window. Officer's observation of plants in window was held to be legal.) *State v. Gott*, 456 S.W.2d 38 (Mo.1970) (Officers at front door to talk to residents looked through window and viewed defendant rolling a marihuana cigarette.) *State v. Dickerson*, 313 N.W.2d 526 (Iowa 1981) (Officers did not invade the defendant's reasonable expectation of privacy by approaching his front door and while looking through the window of the door, viewed stolen tools which had been placed in the entry way.) *State v. Dixon*, 391 So.2d 836 (La.1980) (No unconstitutional invasion of defendant's privacy where officers during investigation of missing juvenile, knocked on defendant's trailer door, and after receiving no response, looked through a glass pane of door and saw a fishbowl containing marihuana plants.) See also *State v. Prevette*, 43 N.C.App. 450, 259 S.E.2d 595 (1979); *State v. White*, 18 Or.App. 352, 525 P.2d 188 (1974); *State v. Drumhiller*, 36 Wash.App. 592, 675 P.2d 631 (1984).

Federal cases appear to run the same way. In *U.S. v. Whaley,* 779 F.2d 585 (11th Cir.1986), officers received a tip that Whaley and his brother had a laboratory for manufacturing cocaine set up in Whaley's basement. Although not invading Whaley's curtilage, the officer's discovered that while sitting on an adjoining neighbor's property, they could look through an uncovered basement window during the nighttime hours and observe the activities in the lighted drug lab. The Eleventh Circuit handled Whaley's claim of an illegal search in the following manner:

"Although appellant might have believed that activity in his basement would not be observed, a reasonable expectation of privacy 'by definition means more than a subjective expectation of not being discovered.' *Rakas v. Illinois,* 439 U.S. 128, 143 n. 12, 99 S.Ct. 421, 430 n. 12, 58 L.Ed.2d 387 (1978); see also *United States v. Christensen,* 524 F.Supp. [344] at 346–47 [ (N.D.Ill.1981) ] (defendant's belief that observation was unlikely is irrelevant when illegal activity is conducted in front of a window facing a public street). As the Second Circuit stated in *United States v. Taborda,* 635 F.2d [131] at 139, n. 10 [ (2nd Cir.1980) ], 'the reasonableness of an expectation of privacy [is] logically dependent principally ... on the degree to which the locale is viewable by a member of the public without visual aids.' " 779 F.2d at 590.

See also *U.S. v. Knight,* 451 F.2d 275 (5th Cir.1971), cert. den. sub. nom. *Grubbs v. U.S.,* 405 U.S. 965, 92 S.Ct. 1171, 31 L.Ed. 2d 240 (1972); *U.S. v. Conner,* 478 F.2d 1320 (7th Cir.1973); *U.S. v. Hanahan,* 442 F.2d 649 (7th Cir.1971); *Nordskog v. Wainwright,* 546 F.2d 69 (5th Cir.1977).

Applying the standards set out in *Katz* and further explained in *Smith v. Maryland,* supra, we conclude that the appellant has not shown a legitimate expectation of privacy that the contents of his garage would remain private. Since appellant did not curtain or otherwise obscure the view into the garage afforded by the windows, he forfeited his expectation of privacy and could not justifiably assume that the interior of the garage would remain free from observation. Compare *Wheeler v. State,* 659 S.W.2d 381 (Tex.Cr.App.1982) (where the defendants clearly manifested their expectation of privacy in their greenhouse). The police made their observations from a place in which they were lawfully entitled to be. Consequently we find there was no illegal search.

■ We now turn to appellant's complaint regarding the sufficiency of the affidavit. He urges that the affidavit does not contain probable cause to show that the ultra light aircraft would be found in the garage and thus the search was in violation of the United States Constitution, Article 1, Sec. 9 of the Texas Constitution and Article 18.01, V.A.C.C.P. The portion of the affidavit in support of the search warrant which purports to set out probable cause is set out below:

"Affiant Weldon Lucas, is a Peace Office of the State of Texas, and is currently employed with the Texas Department of Public Safety as a Texas Ranger, Company B. Affiant is investigating the murders of the individuals named above in Paragraph 4. On October 8, 1983, Bobbie Tate and Bobby Glen Tate, Jr. discovered the body of Ronald Howard Mayes in an aircraft hangar on the property of Bobby Glen Tate, Sr., which property was located in Grayson County, Texas. They notified the Grayson County Sheriff's Office who responded and discovered the bodies of Ronald Howard Mayes, Phillip Boyce Good, Bobby Glen Tate, and Jerry Mac Brown, shot and dead inside the hangar.

"The bodies of the four aforementioned individuals were transported to the Southwestern Institute of Forensic Sciences in Dallas, Texas, for an autopsy, which autopsy was conducted on the 9th day of October, A.D. 1983. From each of the bodies of the aforementioned individuals, during the autopsy, the Southwest Institute of Forensic Sciences advised by written report, that .22 caliber bullets were removed from the bodies.

"The autopsy report advised that each of the bodies of each of the above individuals contained at least one wound from a .22 caliber weapon which was a hard contact wound. On the 20th day of January, 1984, Dr. Irv Stone, pathologist with the Southwest Institute of Forensic Sciences in Dallas, Texas, advised Affiant that there was a likelihood that in connection with the wounds found on the bodies of the four aforementioned individuals by the autopsy that blood could have splattered or squirted from the wound either at the time the shot was fired or when the weapon was removed from the body and that blood from this splattering or squirting could have gotten upon the shoes or clothes of the individual who fired the shots. Dr. Stone further advised that there was a great likelihood that blood from one or more of the bodies could have gotten upon the shoes or clothing of the individual who moved the bodies after they were shot.

"On October 8, 1983, Bobbie Tate, wife of Bobby Glen Tate, Sr., reported to the Grayson County Sheriff's Office that the above described ultralight aircraft was missing from the hangar where the bodies of the four individuals named above were found and that the aircraft had been in that hangar earlier on the day of October 8, 1983, fully assembled. Mrs. Tate advised that the ultralight aircraft missing had been covered by a bright orange and yellow fabric. Marlene Good, wife of Phillip Boyce Good, advised that her husband was attempting to sell the above described ultralight aircraft for Bobby Glen Tate and that its value according to the price being asked was $3,000.00.

"On the evening of October 8, 1983, a crime scene search was conducted at the aircraft hangar where the bodies of the four individuals above named were found, by numerous deputies of the Grayson County Sheriff's Office. During this search eleven (11) .22 caliber shell casings were found at the crime scene which were seized and preserved by the deputies of the Grayson County Sheriff's Department.

These shell casings were subsequently furnished to the Southwestern Institute of Forensic Sciences in Dallas, Texas, for examination. Larry Fletcher, a firearms examiner employed by the Southwest Institute of Forensic Sciences in Dallas, Texas, has informed Affiant that the eleven (11) .22 caliber shell casings found at the crime scene were JULIO FIOCCHI shell casings. Larry Fletcher advised that in his opinion, after examining the shell casings previously mentioned and examining the spent projectiles removed from the bodies of the four individuals above named, that the bullets causing the death were fired from a Charter Arms AR-7 Ruger, Winchester or High Standard brand automatic or semi-automatic firearm. Fletcher advised further that the markings on the spent projectiles removed from the bodies of the victims were consistent with their having been fired from a weapon equipped with a firearms silencer.

"Special Agent Jim Blanton, FBI, has advised Affiant that the records of Bingham Arms Limited show that on February 12, 1982, Lester Leroy Bower, ordered 150 rounds of JULIO FIOCCHI brass cases .22 caliber lead hollow point, asonic ammunition and on December 10, 1982, Lester Leroy Bower ordered 250 rounds of said ammunition to be delivered at 590 Briarwood Lane, Grand Junction, Colorado, which is the address which appears on Lester Leroy Bowers. Jr. federal firearms license, said license having number 58403901B3122269-22183. Don Bell, U.S. Treasury Department, Bureau of Alcohol, Tobacco and Firearms, has advised that the above listed federal firearms license was issued to Bower at the address 590 Briarwood Lane, Grand Junction, Colorado.

"Marlene Good, wife of the victim Phillip Boyce Good, then an ultralight aircraft dealer, has informed Affiant that on approximately September 30, 1983, she overheard part of a conversation between her husband and an unknown caller wherein her husband told the caller that the caller would have no trouble with his weight if

the caller should purchase Tate's said ultralight aircraft, and that the caller's weight of 250 pounds would be no problem.

"During the crime scene search of the hangar where the bodies of the above mentioned individuals were found, there was found cut metal rings used in the assembly and disassembly of the ultralight aircraft.

"Affiant is in possession of a manufacturer's brochure of ultra light aircraft which advertises that an ultralight aircraft of the type stolen and described in Paragraph No. 2 above, can be easlily (sic) disassembled and hand carried.

"Deputies of the Grayson County Sheriff's Office advise that on October 8, 1983, when the crime scene search was conducted, the area surrounding the hangar was wet and muddy.

"Affiant has personally examined the records of Southwestern Bell Telephone Company showing that on September 30, 1983, a call was made from the Duncanville Texas Public Library to Phillip Boyce Good's home in Sherman, Texas, the conversation lasting approximately 10 minutes and that on October 3, 1983, a call was made from Thompson Hayward Chemical Company, 2627 Weir in the City of Dallas to Phillip Boyce Good's home in Sherman, Texas, the conversation lasting approximately 2 minutes. During an interview with Bower on January 13, 1984, Bower admitted making said phone calls to Phillip Good's home for the purpose of the ultralight aircraft described above, in response to an advertisement in GLIDER RIDER magazine. Bower further told Affiant that he was a glider and ultralight enthusiast and that he was an employee of Thompson Hayward Chemical Company.

"Richard Mann, an employee of Thompson Hayward Chemical Company, advised Special Agent Jim Knights that on January 3, 1984, Bower told Mann that he had in his possession either an ultralight aircraft, or the parts to an ultralight aircraft, which he intended to fly. On January 11, 1984, Bower listed for Special Agent Knights approximately one dozen firearms by make and caliber, which he, Bower, owned.

"John Whitney, a special agent of the FBI, contacted Paladin Press, a weapons information publishing company in Boulder, Colorado, and informed Affiant that the records of said company reveal that in February of 1983, a Lester Bower, 590 Briarwood, Grand Junction, Colorado, ordered a publication entitled 'The AR–7 Exotic Weapons System', showing how to convert the Charter Arms AR–7 rifle into a silenced, fully automatic weapon. Whitney has informed Affiant that on January 16, 1984, he interviewed Howard E. Hendricks, a 20 year member of the Arlington, Texas Sportsmen's Club, who told Whitney that Bower is a member of said club, and that he has seen Bower firing a .22 caliber semi-automatic pistol, possibly a Ruger, at the Club's range. The latter is a rim fire weapon, according to Hendricks.

"Dr. Irv Stone of the Southwestern Institute of Forensic Sciences in Dallas, Texas, has informed Affiant that he examined photographs of the wounds on the bodies of the above victims and that said wounds were contact wounds with very little power (sic) strippling, being consistent with the use of a silenced weapon.

"On Friday, January 13, 1984, Affiant went to the premises described in Paragraph 1 above and observed, from outside the garage of said premises, aluminum tubing of the type used in the framework of an ultralight aircraft.

"Affiant has determined from the records of the U.S. Treasury Department Alcohol, Tobacco and Firearms Bureau, that Bower's address currently listed on his Federal Firearm Dealer's License is 3008 Quail Lane, Arlington, Texas."

In the recent case of *Illinois v. Gates,* 462 U.S. 213, 103 S.Ct. 2317, 2336, 76 L.Ed. 2d 527 (1983), the Supreme Court abandoned the two-pronged test of Aguilar and Spinelli and applied a "totality-of-the-circumstances" analysis for the determination of probable cause under the Fourth

Amendment. See also *Massachusetts v. Upton*, 466 U.S. 727, 104 S.Ct. 2085, 80 L.Ed.2d 721 (1984); *Whaley v. State*, 686 S.W.2d 950 (Tex.Cr.App.1985); *Hennessy v. State*, 660 S.W.2d 87 (Tex.Cr.App.1983). Noting that the probable cause standard is practical and not technical, the Court affirmed the idea that the basis of probable cause is *probability*. *Brinegar v. United States*, 338 U.S. 160, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949). Cf. *Tolentino v. State*, 638 S.W.2d 499 (Tex.Cr.App.1982). The Court stressed that the magistrate is not bound by such finely tuned standards as proof beyond a reasonable doubt or by a preponderance of the evidence; rather his sole concern should be probability. *Illinois v. Gates*, supra; *Winkles v. State*, 634 S.W.2d 289 (Tex.Cr.App.1982) (Opinion on Rehearing).

In *United States v. Ventresca*, 380 U.S. 102, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965), the Supreme Court had stressed that the magistrates determination of probable cause should be given great deference by reviewing courts:

"Although in a particular case, it may not be easy to determine when an affidavit demonstrates the existence of probable cause, the resolution of doubtful or marginal cases in this area should be largely determined by the preference to be accorded to warrants," *United States v. Ventresca*, 380 U.S. 102, 109, 85 S.Ct. 741, 746, 13 L.Ed.2d 684 (1965).

This was reaffirmed in *Gates* and the Court went on to add that reviewing courts should not make a *de novo* probable cause determination but rather, after viewing the evidence as a whole, should determine only if there is substantial evidence in the record supporting the magistrate's decision to issue the warrant.

"Reflecting this preference for the warrant process, the traditional standard for review of an issuing magistrate's probable-cause determination has been that so long as the magistrate had a 'substantial basis for ... conclud[ing]' that a search would uncover evidence of

wrongdoing, the Fourth Amendment requires no more. *Jones v. United States*, 362 U.S. 257, 271, 4 L.Ed.2d 697, 80 S.Ct. 725 [736], 78 ALR2d 233 (1960). See *United States v. Harris*, 403 U.S. [573] at 577–583, 29 L.Ed.2d 723, 91 S.Ct. 2075 [2078–2082 (1971)]." 462 U.S. at 236–237, 103 S.Ct. at 2331, 76 L.Ed.2d at 547 (footnote omitted).

See also *Massachusetts v. Upton*, supra; *Hennessey v. State*, supra. With these axioms in mind, we now address appellant's contentions concerning the probable cause.

Probable cause to support the issuance of a search warrant exists where the facts submitted to the magistrate are sufficient to justify a conclusion that the object of the search is probably on the premises to be searched at the time the warrant is issued. *Cassias v. State*, 719 S.W.2d 585 (Tex.Cr.App.1986); *Schmidt v. State*, 659 S.W.2d 420 (Tex.Cr.App.1983). While there is no firsthand evidence in the affidavit that the ultra light airplane was in either appellant's house or garage at the time of the search, this does not mean the affidavit lacked probable cause. It is only necessary that "the facts and circumstances described in the affidavit would warrant a man of reasonable caution to believe that the articles sought were located" at the place where it was proposed to search. *United States v. Rahn*, 511 F.2d 290 (10th Cir.1975). For instance, in *Elliott v. State*, 687 S.W.2d 359 (Tex.Cr.App.1985), we found it reasonable to assume that a suspect who was running a gambling operation out of his residence had gambling paraphernalia in his residence. Federal courts have held that evidence that a defendant has stolen material which one normally would expect him to hide at his residence will support a search of his residence. *United States v. Lucarz*, 430 F.2d 1051 (9th Cir.1970); *United States v. Rahn*, supra. Likewise, a search of an alleged murderer's living quarters for bloodstained clothing was approved under the same rationale in *Iverson v. State of North Dakota*, 480 F.2d 414 (8th Cir.1973).

In addition, there is no set time limit on how old information contained in an affida-

vit may be. In *Moore v. State*, 456 S.W.2d 114 (Tex.Cr.App.1970), this Court noted that just how long a time may be permitted to elapse without destroying the basis for a reasonable belief as to the continuance of the situation set forth in the affidavit will vary according to the facts of the individual case. In *Smith v. State*, 23 S.W.2d 387 (Tex.Cr.App.1929), an affidavit was approved which recited that the affiants received their information thirty days prior to the issuance of the warrant.

The affidavit set out above indicates that the offense occurred on October 8, 1983. The magistrate signed the search warrant on January 20, 1984. The only information in the affidavit relating to whereabouts of the ultra light aircraft was the fact that Richard Mann, an employee of Thompson Hayward Chemical Company, advised Special Agent Jim Knights that on January 3, 1984, Bower told Mann that he had in his possession either an ultra light aircraft, or the parts to an ultra light aircraft, which he intended to fly and then on Friday, January 13, 1984, Ranger Lucas went to the appellant's house and observed, by looking through the garage windows, aluminum tubing of the type used in the framework of an ultra light aircraft. Based on the totality of these circumstances, appellant's residence was the only logical place to conduct the search for the ultra light airplane. Furthermore, we find that a period of seven days did not render such information stale. Therefore we find that the affidavit provided a substantial basis from which a reasonable and disinterested magistrate could have concluded that the ultra light airplane was on the premises sought to be searched. *United States v. Maestas*, 546 F.2d 1177 (5th Cir.1977).

■ As noted above, appellant also invoked his state constitutional protection under Article I, Section 9 of the Texas Constitution. We have found sufficient probable cause under the Fourth Amendment. But we must still determine whether the Texas Constitution provides more protection than the Fourth Amendment, or more particular-

ly, does the test of *Illinois v. Gates*, supra, apply under the Texas Constitution.

Clearly, the states of the Union are justified in providing a greater degree of protection to their citizens than is provided by the United States Constitution. See *Cooper v. California*, 386 U.S. 58, 87 S.Ct. 788, 17 L.Ed.2d 730 (1967). However, in regard to Article I, Section 9, supra, a plurality of this Court most recently declined an "invitation to attach to Art. I, § 9 of our Texas Constitution a more restrictive standard of protection than that provided by the Fourth Amendment." *Brown v. State*, 657 S.W.2d 797, 798 (Tex.Cr.App.1983). We again follow this holding and continue to interpret our Texas constitution in harmony with the Supreme Court's opinions interpreting the Fourth Amendment. We now formally adopt the "totality of the circumstances" test adopted in *Gates* and abandon the "two prong" test of *Aguilar* and *Spinelli*.

There are several reasons for our holding today. First, there is no substantial textual differences between the Fourth Amendment to the United States Constitution and Article I, Section 9 of the Texas Constitution. Thus, there is nothing to suggest in the language of Article I, Section 9, which suggests that it would offer greater protection. Second, the test of *Gates* involves a common sense, nontechnical analysis and there is more reasonable than the rigid formalistic test of *Aguilar* and *Spinelli*. As the Supreme Court stated in *Gates*:

"... probable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules ...

"Moreover, the 'two-pronged test' directs analysis into two largely independent channels—the informant's 'veracity' or 'reliability' and 'his basis of knowledge.... Instead, they are better understood as relevant considerations in the totality of the circumstances analysis that has traditionally guided probable cause determinations...." *Illinois v. Gates*, 103 S.Ct. at 2328–2329.

Because of all of the above, we hereby adopt the "totality of the circumstances" approach as the proper standard of review under Article I, Section 9 of the Texas Constitution. The affidavit in the instant case contained sufficient probable cause. Appellant's fourth point of error is overruled.

■ The search warrant authorized the officers to seize the following items:

"Stolen property, to-wit: an ultralight aircraft being an American Ultralights, Inc., Eagle Model 4904, Serial No. 102045, Engine No. 15949; and instrumentalities of the crime of murder, to-wit: a weapon which is a .22 caliber firearm and a quantity of .22 caliber ammunition and a firearm silencer; and evidence of the crime of the and (sic) murder which are books, magazines, pamphlets or other written or printed material concerning the manufacture, building, constructing or altering of ultralight aircraft, firearms or firearm silencers, or other written or printed material concerning or evidencing the purchase or sale of ultralight aircraft or firearms or firearms silencers; hand and power operated metal cutting, drilling, shaping and forming tools; muddy clothing and boots, or clothing and boots bearing stains which could be blood."

During the search of appellant's house and garage, officers found a briefcase in appellant's Ford LTD. The contents of the briefcase were seized and admitted into evidence during the trial. Included in this evidence was State's Exhibit 68e, a firearms acquisition and disposition record and State's Exhibit 68f, a firearms transaction record. These records showed that appellant had purchased a .22 caliber Ruger RST-6 pistol, thought to have been the murder weapon in the instant case.

In a multifarious point of error, appellant argues that these firearms records were illegally seized under Articles 18.01 and 18.02(10), V.A.C.C.P. Initially appellant contends that the seizure of the firearms records was invalid in that the search warrant did not specifically describe such documents nor was there probable cause to show that the firearms records would be located in appellant's car. Thus, appellant asserts, the officers were engaged in a "global search" which Article 18.01(c) was designed to prohibit.

Article 18.02(10), supra, permits a search warrant to be issued for "property or items, except the personal writings by the accused, constituting evidence of an offense or constituting evidence tending to show that a particular person committed an offense." Article 18.01(c), supra, states that a warrant may not be issued under Article 18.02(10), unless the sworn affidavit sets forth sufficient facts to establish probable cause that:

1. a specific offense has been committed;

2. the specifically described property or items that are to be searched for or seized constitute evidence of that offense or evidence that a particular person committed that offense; and

3. the property or items constituting evidence to be searched for or seized are located at or on the particular person, place, or thing to be searched.

*Tolentino v. State,* supra.

Although the documents were not specifically described, we find that the warrant authorized the officers to look for any "written or printed material concerning or evidencing the purchase or sale ... of firearms." Information known to the officers established that the victims were shot with .22 caliber bullets, that appellant had twice purchased .22 caliber ammunition, and that appellant had been seen at a local firing range shooting a .22 caliber weapon. Although these documents were not specifically described in the search warrant, sufficient information was provided which would demonstrate that documents containing this information probably existed. Thus we find that there was sufficient direction given to the officers so that they were not engaged in a global search.

As to appellant's contention concerning the location of the documents in the Ford, we find this to be an issue of first impression. Article 18.01(c) appears to impose a severe burden on the State in providing probable cause for the location of the items to be seized. The question before us is "how detailed must the probable cause be in terms of location of the items to be seized?" In the instant case, the warrant specifically commanded the executing officers to search appellant's home, "a Ford LTD four-door white in color bearing Texas registration 280DMB" and two other particularly described vehicles. Was it encumbent under the statute for the affidavit to furnish probable cause as to the exact location, be it house, garage, vehicle # 1, vehicle # 2, vehicle # 3? We do not think this was the intent of the legislature when they drafted that provision and we have not found any case law which would support that position. Rather, we believe Article 18.01(c)(3) merely requires that there be probable cause to believe that the items would be located in the general location, i.e. somewhere within appellant's residence, which included the automobiles parked inside his garage and on the premises. To require anything more specific would be to require the impossible.

Appellant also contends in the same point of error that the firearms records were improperly seized in that they were his own personal writings and therefore not seizable under Article 18.02(10) V.A.C.C.P. Our review of the record shows that appellant's latter contention on appeal does not comport with the objections he made in the court below. Therefore, no error is preserved. In his motion to suppress, at the hearing on his motion to suppress and during the trial of the case, appellant did invoke Article 18.01, supra. However, his invocation only went to the argument that there was insufficient probable cause to justify the issuance of the warrant. The trial court was not asked to rule on the contention now presented. Thus we will not address it.

Finally, appellant asks us to hold that Article I, Sec. 9, Texas Constitution, imposes a more restrictive standard of protection than the Fourth Amendment. We have refused such requests in the past and we do so again. *Brown v. State*, supra. Appellant's fifth point of error is overruled.

In his sixth point of error, appellant complains of the seizure of State's Exhibit 68c (a letter sent by Catawba Enterprises, a manufacturer of silencers, to customers who purchased goods from them). We find our analysis above relating to the seizure of appellant's firearms records applicable to this contention. Although the letter was not specifically described in the warrant, the warrant did authorize the officers to look for any "written or printed material concerning or evidencing the purchase or sale ... of firearms silencers." Information known to the officers established that the victims were shot with a gun equipped with a silencer. Although this letter was not specifically described in the search warrant, sufficient information was given which authorized the officers to seize the letter upon its discovery. This point of error is overruled.

In his seventh and eighth points of error, appellant complains about the seizure of a number of items not specifically listed in the search warrant: State's Exhibit 67, the sledge hammer; State's Exhibit 113, the metal fragments found in the trunk of the Ford LTD; State's Exhibit 114, the ashes found in the trunk of the Ford LTD; State's Exhibit 54(a)–(g), books, manuals, and catalogs; State's Exhibit 54(h), an Allen wrench; State's Exhibit 54(i), a folder containing appellant's federal firearms license; State's Exhibit 56, a pair of rubber boots; State's Exhibit 57, the ultra light warning stickers; State's Exhibit 58, a Cuyuna engine manual; State's Exhibit 59–60, books; State's Exhibit 61, three keys; State's Exhibit 62–63, books; State's Exhibit 64, the ultra light harness; State's Exhibit 65, the boat seat; State's Exhibit 66, the blue nylon bag; and State's Exhibit 68(a), (b), (d), (g) and (h), documents, forms, records and personal writ-

ings of the appellant. He argues that the seizure of such items exceeded the scope of the search and therefore were illegally seized.

As noted above in our discussion of the fifth point of error, appellant's only argument regarding the search in his motion to suppress, at the hearing on the motion to suppress, and at trial was that there was insufficient probable cause to justify the issuance of the warrant. Appellant now complains of an exploratory search. The trial court was never asked to rule on this contention and we are constrained to hold that appellant's argument on appeal does not comport with the argument he made at trial.

■ Even had appellant preserved this ground for review, we would find his argument to be without merit. An officer may seize mere evidence of a crime even though such property is not particularly described in the search warrant when the objects discovered and seized are reasonably related to the offense in question, when the officer at the time of the seizure has a reasonable basis for drawing a connection between the observed objects and the crime which furnished the basis for the search warrant, and the discovery of such property is made in the course of a good faith search conducted within the perimeters of the search warrant. *Warden v. Hayden,* 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967).

As held above, the officers were lawfully on the premises under the warrant in connection with the investigation of the murders. During their search, the officers had discovered several incriminating items, including the ultra light tubing, the ultra light wheels and the records concerning appellant's ownership of a .22 caliber pistol. It was reasonable for the officers to conclude that the additional items listed in these two points of error also had a relationship to the crime being investigated. *Oubre v. State,* 542 S.W.2d 875 (Tex.Cr. App.1976); *Chambers v. State,* 508 S.W.2d 348 (Tex.Cr.App.1974); *Phenix v. State,*

488 S.W.2d 759 (Tex.Cr.App.1972). Appellant's seventh and eighth points of error are overruled.

In two points of error appellant complains about two instances of jury argument by the prosecutor. Appellant did not testify at either phase of his trial. During the closing argument at the punishment phase of the trial, the prosecution argued the following:

"Looking at what type of guy he is— Something else Mr. Buckner said I thought really hit it on the head. He said, 'The only type of people who would be shooting somebody with silencers and small caliber weapons are mafia hitmen.' Now, he's not a mafia hitman—don't get me wrong—but that's the type of people who do it.

"This was done, all planned out. Awfully professionally. And it makes you wonder what kind of character in life this man has lead, until we have discovered him. No, he's no mafia hitman. But I'll tell you one thing, he has one characteristic other than guns and silencers and planning things out that is just like them, and probably worse. Not one single bit of remorse for what he did. Look at him. Do you see him right now? Do you see him feel bad for what he did? Does he feel bad?"

Defense counsel immediately objected that the prosecutor's argument was a comment on the appellant's failure to testify and a failure to show remorse. The trial court sustained the objection, instructed the jury not to consider the remark and overruled appellant's motion for mistrial.

Article 38.08, V.A.C.C.P., prohibits any comment on the right of an accused person to remain silent or his failure to testify. In order to constitute a violation of Article 38.08, supra, the language must be either manifestly intended, or of such a character that the jury would naturally and necessarily take it to be a comment on the defendant's failure to testify. *Cook v. State,* 702 S.W.2d 597 (Tex.Cr.App.1984); *Banks v. State,* 643 S.W.2d 129 (Tex.Cr.App.1982);

*Angel v. State,* 627 S.W.2d 424 (Tex.Cr. App.1982). The challenged comment must be viewed from the standpoint of the jury and the language must be more than an implied or indirect allusion to the defendant's silence. *Angel v. State,* supra; *Bird v. State,* 527 S.W.2d 891 (Tex.Cr.App.1975); *Anderson v. State,* 525 S.W.2d 20 (Tex.Cr. App.1975).

In *Dickinson v. State,* 685 S.W.2d 320 (Tex.Cr.App.1984), this Court condemned a very similar argument made during the punishment phase of Dickinson's trial:

> "And you know, another pretty important [piece of] evidence that you can consider is what you've observed of this man right here...."

> "You haven't seen one iota of remorse, one iota of shame...."

> "And you didn't see any pity for that nine-year old retarded girl that was led into this courtroom from that man over there." (emphasis in opinion)

The defendant's objections to these arguments were all overruled and on appeal, this Court found that the arguments amounted to a comment on the defendant's failure to testify and did not fall within the four areas of permissible jury argument. *Alejandro v. State,* 493 S.W.2d 230 (Tex. Cr.App.1973). See also *Good v. State,* 723 S.W.2d 734 (Tex.Cr.App.1986) (where we held that the reference to the defendant's nontestimonial demeanor at the guilt-innocence portion of the trial did not fall within one of the four approved areas of jury argument, and since the defendant's objection to the argument was overruled, reversal was mandated).

■ We agree that the argument made by the prosecutor was a comment on the defendant's failure to testify. However, we believe that the error was cured by the court's sustaining of appellant's objection and the instruction to disregard. Ordinarily, any injury from improper jury argument is obviated when the court instructs the jury to disregard, unless the remark is so inflammatory that its prejudicial effect cannot reasonably be removed by such an admonishment. *McKay v. State,* 707 S.W. 2d 23 (Tex.Cr.App.1985); *Logan v. State,* 698 S.W.2d 680 (Tex.Cr.App.1985). In *Hawkins v. State,* 660 S.W.2d 65 (Tex.Cr. App.1983), the prosecutor made a remark very similar to that made in the case at bar regarding a lack of any showing of remorse by Hawkins during the trial. This Court found that the trial court's instruction to disregard was sufficient to cure any error. We reach the same conclusion in the instant case. Our examination of the trial record fails to demonstrate that the prosecutor's argument was so prejudicial that it could not be cured by any admonishment to disregard. *Davis v. State,* 645 S.W.2d 817 (Tex.Cr.App.1983). Appellant's first point of error is overruled.

■ Immediately after the argument set out above, the prosecutor then continued:

> "You can see him in the Courtroom. You can look at him.

> "He talked to the FBI. He talked to those FBI Agents on three occasions. At one time did he ever say, 'Gosh, I don't know what got into me. I did it and I feel horrible. I'm sorry.'? Never.

> "What type of a man is he?"

Once again defense counsel objected that the prosecutor was commenting on appellant's failure to testify. This time the court overruled the objection.

Appellant argues on appeal that this argument was also a comment on his failure to testify at the punishment hearing. We disagree. Our reading of the record shows that the argument alluded to facts in evidence. During the trial, the State called two FBI agents who testified about their investigation of this case. The agents testified that the appellant spoke to them on several occasions during the investigation. These conversations were quite lengthy and concerned a variety of topics including appellant's interest in ultra lights. The record shows that during these conversations appellant made no confession to the

agents. Clearly, the prosecutor's argument was a summary of the evidence and was not a comment on appellant's failure to testify. We overrule this point of error.

■ In his final point of error, appellant argues that the "death qualification" of jurors denied him his Sixth Amendment right to a cross-sectional jury. He relies on *Grigsby v. Mabry*, 758 F.2d 226 (8th Cir. 1985). We must overrule this contention.

*Grigsby*, the Eighth Circuit case cited by appellant, went on to the Supreme Court and the decision of the 8th Circuit Court was reversed. Then, in *Lockhart v. McCree*, 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986), the Supreme Court held that "the fair cross section" requirement does not apply to petit juries. The Court wrote:

> "The Eighth Circuit ruled that 'death qualification' violated McCree's right under the Sixth Amendment, as applied to the States via incorporation through the Fourteenth Amendment, see *Duncan v. Louisiana*, 391 U.S. 145, 148–158 [88 S.Ct. 1444, 1446–1452, 20 L.Ed.2d 491] (1968), to a jury selected from a representative cross-section of the community. But we do not believe that the fair cross-section requirement can, or should, be applied as broadly as that court attempted to apply it. We have never invoked the fair cross-section principle to invalidate the use of either for-cause or peremptory challenges to prospective jurors, or to require petit juries, as opposed to jury panels or venires, to reflect the composition of the community at large. See *Duren v. Missouri*, 439 U.S. 357, 363–364 [99 S.Ct. 664, 668–669, 58 L.Ed.2d 579] (1979); *Taylor v. Louisiana*, 419 U.S. 522, 538 [95 S.Ct. 692, 701, 42 L.Ed. 2d 690] (1975) ('[W]e impose no requirement that petit juries actually chosen must mirror the community and reflect the various distinctive groups in the population'); cf. *Batson v. Kentucky*, [476] U.S. [79], [84], n. 4 [106 S.Ct. 1712, 1716, n. 4, 90 L.Ed.2d 69] (1986) (expressly declining to address 'fair cross-section'

challenge to discriminatory use of peremptory challenges). The limited scope of the fair cross-section requirement is a direct and inevitable consequence of the practical impossibility of providing each criminal defendant with a truly 'representative' petit jury, see id., at [85], n. 6 [106 S.Ct. at 1717, n. 6], a basic truth that the Court of Appeals itself acknowledged for many years prior to its decision in the instant case. See *United States v. Childress*, 715 F.2d 1313 (CA8 1983) (en banc), cert. denied., 464 U.S. 1063 [104 S.Ct. 744, 79 L.Ed.2d 202] (1984); *Pope v. United States*, 372 F.2d 710, 725 (CA8 1967) (Blackmun, J.) ('The point at which an accused is entitled to a fair cross-section of the community is when the names are put in the box from which the panels are drawn'), vacated on other grounds, 392 U.S. 651 [88 S.Ct. 2145, 20 L.Ed.2d 1317] (1968). We remain convinced that an extension of the fair cross-section requirement to petit juries would be unworkable and unsound, and we decline McCree's invitation to adopt such an extension." *Lockhart v. McCree*, 106 S.Ct. at 1765 (footnote omitted)

We follow the Supreme Court's pronouncements in *Lockhart v. McCree*, supra. *Modden v. State*, 721 S.W.2d 859 (Tex.Cr.App. 1986). Appellant's twelfth point of error is overruled.

Having found no reversible error, we affirm the judgments of the trial court.

MILLER, DUNCAN and CAMPBELL, JJ., concur in the result.

TEAGUE, J., only dissents to the disposition that is made in the majority opinion of all grounds of error except those numbered ten, eleven, and twelve.

CLINTON, Judge, dissenting.

Anent point of error four, the opinion of the Court is anticlimatic: In *Eisenhauer v. State*, 754 S.W.2d 159 (Tex.Cr.App.1988),

a majority finally managed "to stay in step with the federal constitutional model for probable cause determinations," *id.*, at 164. For the reasons developed in my dissenting opinion in that cause, *id.*, at 166 ff, and also in my concurring opinion in *Brown v. State*, 657 S.W.2d 797, 799 ff, such close order is a drill repugnant to our forebearers.

To yet another assault on the sovereignty of this State, I dissent.