Charles McGee DILLARD, Appellant,

v.

The STATE of Texas, Appellee.

No. 05–94–01801–CR.

Court of Appeals of Texas, Dallas.

Aug. 30, 1996.

Jeffrey B. Keck, Dallas, for appellant.

Patricia Poppoff Noble, Dallas, for appellee.

Before LAGARDE, WRIGHT and CAMPBELL[1], JJ.

1. The Honorable Charles M. Campbell, Former Justice, Court of Criminal Appeals, sitting by assignment.

## OPINION

LAGARDE, Justice.

Charles McGee Dillard appeals his conviction by a jury of the offense of capital murder. Punishment was assessed at confinement for life. Dillard raises four points of error, contending that: (1) the evidence is legally and factually insufficient to show that he had the requisite intent to kill the deceased; (2) the evidence is legally and factually insufficient to show that he killed the deceased in the course of robbery; (3) the trial court erred in not declaring a mistrial after testimony was introduced concerning an extraneous offense; and (4) the trial court erred in allowing the introduction of the results of a hand-wiping test performed on the deceased's hands. We overrule appellant's points of error and affirm the trial court's judgment.

## FACTS

Appellant was accused of causing the death of Alan Paxton by shooting Paxton with a firearm while in the course of committing robbery. Charles Allen, a security guard, testified that in February 1994 he was working at the Diamond Ridge apartment complex. There were large numbers of gang members in the area as well as a "lot of drugs in the apartment complex." Late on February 16, 1994 or in the early morning hours of February 17, he saw appellant's youngest brother, Simeon, and another brother, Antywon. He had had trouble with the Dillard family since first arriving on the job. He issued Antywon a warning for criminal trespass because Antywon, Simeon, a cousin, and three other people were standing on a corner selling drugs. Allen identified appellant as the cousin, who went by the nickname "Pork Chop."

On February 16, Allen encountered Paxton while Paxton was standing in the parking lot of the complex. Allen told Paxton not to loiter on the property. Allen saw him a second time approximately an hour after the first encounter. As of February 17, Allen had worked in the area for approximately a year. He was well acquainted with the individuals in the area.

Early in the morning of February 17, Paxton's cousin told Allen that Paxton had been shot. Allen drove to an apartment where he found Paxton bleeding from a gunshot wound in the shoulder. Allen called the police and an ambulance.

Before Allen found Paxton, he saw a number of people running into apartment 2073 in the complex. He told the police that he had seen the people running to the apartment. The police accompanied him to the apartment. When they knocked on the door, no one came to the door. Allen had recognized appellant and Antywon as two of the people running into the apartment. Allen admitted that he had a previous conviction for aggravated assault.

On cross-examination, Allen testified that when Allen first saw Paxton, he could have been standing there as long as fifteen minutes. Allen told Paxton that he needed to stay on "the other side there because this side of the corner is hot." When Allen came back approximately an hour later, he saw Paxton there again. This time, he saw what he perceived to be a drug deal. Allen called the police and told them where Paxton stayed, as well as the fact that Allen believed he had seen a drug deal. Allen also testified that he did not see Paxton get shot. On redirect, Allen testified that, when he saw the drug deal, he saw Paxton produce money from his wallet.

Dale Dabbs testified that in February 1994, he was living across the street from the Diamond Ridge apartment complex. Paxton, who was the brother of Dabbs's girlfriend, came over to Dabbs's apartment on February 16, 1994. Paxton was a cocaine user. On February 16, Paxton had just been paid when he came over. Shortly after midnight, Paxton told his sister that he was going to get "something to smoke." Dabbs took this to mean that Paxton was going to buy crack cocaine. Paxton went across the street and approached a man. Dabbs warned Paxton not to buy from the man. The man approached Paxton and Dabbs and asked "You looking for it?" Dabbs took this to be a question about whether Paxton wanted to buy cocaine. Paxton told the man that he wanted one rock, and asked the man to

change a $100 bill. The man pulled a bag of crack cocaine from his pocket and Paxton picked out the one he wanted, handing the man a $100 bill. The man pulled his left shoe off, then his right shoe, saying he was "fixing to change this $100 bill." Dabbs considered this very unfamiliar and unusual. Dabbs got Paxton's attention and told him that there was something wrong. Paxton then told the man "That's okay. I don't want it, just give me my money back." The man told Paxton to return the cocaine. Paxton gave the cocaine back, but rather than return Paxton's money, the man turned and ran. Paxton ran after him. The two men disappeared around a corner. Dabbs began running after them, but stopped when someone upstairs in the complex asked what Dabbs was doing to "my cousin." Dabbs was worried the man had a gun, so he stopped. Shortly thereafter, Dabbs heard a gunshot and ran to check on Paxton. He found Paxton lying on a concrete slab. The man who shot him was running away with the gun in his hand, looking back at Dabbs.[2]

Dabbs noticed that there might have been a struggle. The dealer had been wearing headphones when Dabbs and Paxton first encountered him. When Dabbs found Paxton, the headphones were lying approximately four feet away from Paxton. The radio that went with the headphones was three feet on the other side of Paxton. Paxton's hat was about six feet away. Dabbs helped Paxton up, and Paxton began running on his own. They returned to Dabbs's apartment, where Paxton collapsed. Dabbs flagged down Charles Allen, the security guard, told him what was going on, and asked him to call the police and paramedics. Dabbs testified that in the hours before Paxton crossed the street to buy drugs, he did not know exactly what Paxton had been doing. Dabbs identified appellant as the person he saw running away from Paxton with a gun.

Dabbs also testified that he spoke with the police and was given the opportunity to look at photographic lineups. He said that the police never highlighted, suggested, or coerced him to pick out a photograph. However, Dabbs did select a photograph for the police. When he first saw a photograph of Antywon Dillard, he told them that Antywon looked like the killer, except that Antywon was shorter. Antywon was brought into the courtroom. The court took note that appellant was two to three inches taller than Antywon. After Paxton was shot he had a few papers in his pocket, but his wallet was missing. He had the wallet when he first went across the street. Dabbs also testified that, at the time of trial, there was a warrant out for his arrest for misdemeanor assault.

On cross-examination, Dabbs testified that a judge had released the arrest warrant on his assault charge. Dabbs also admitted that when he first spoke with police he told them that Paxton was going to the mailbox at the time of the incident. He also admitted that he had told them he was forty feet away from appellant at that time. He did not tell the police about a drug transaction at that time. When asked which version was the truth, Dabbs told them that what he was now testifying to was the truth. He said that at the time he made the statement he mentioned that Paxton's wallet was missing. He examined Defense Exhibit No. 1, his statement to the police, and said that although he did not see anything in the statement to the effect that the wallet was missing, he had, in fact, mentioned it to police. Dabbs testified that when he first went to the police station they gave him a lineup that included a picture of Antywon Dillard. He looked like the man who had done the shooting. However, on March 4 the police had more pictures. This time Dabbs picked appellant's picture immediately. He also admitted he did not actually see who shot Paxton.

On redirect examination, Dabbs explained that he did not tell the police the complete truth about the nature of the transaction because his girlfriend had spoken to police first and she had not wanted members of the family to know that Paxton was involved with drugs. He did tell the police, though, that after Paxton and appellant were together, appellant ran from Paxton and Paxton ran after him. Dabbs also told the police that someone came down the stairs in the apartment complex wanting to know what Dabbs

2. On cross-examination, Dabbs admitted that he did not actually see who shot Paxton.

was doing to the man's cousin. He also told police that he heard a gunshot and saw appellant run away from Paxton.

Robert F. Owens, a lieutenant with the Dallas Police Department, testified that on February 17, 1994 he responded to a call concerning a shooting. He was summoned to an apartment in the Rothington Place Townhomes across the street from the Diamond Ridge Apartments. He saw an ambulance at the address he had been given. The attendants were in one of the apartments working on a man lying on the floor. Owens secured the scene, then spoke with Dabbs. He did not believe that Dabbs was under the influence of alcohol or a controlled substance at that time.

Owens described the Diamond Ridge Apartments as a source of a large number of disturbance calls, calls concerning drug sales, and shootings. He said that the policy of giving warnings on criminal trespass is a policy sanctioned by the Dallas Police Department. On cross-examination, Owens testified that there was no time to search for identification on Paxton's person when the paramedics were working on him.

Kenneth LeCesne, a sergeant with the Dallas Police Department, testified that he had worked in the area of the Diamond Ridge apartment complex. Some dealers engage in a practice known as "shortstopping" which he described as a situation where someone stops potential customers who are approaching a crack house. At times these individuals sell fake drugs such as soap or sheetrock which they pass off as crack cocaine. Nine times out of ten a person engaging in this practice is armed because the person is interfering with the crack house's business.

LeCesne testified that an individual who buys fake drugs is described as "jacked." If that person does not demand his or her money back they will get a reputation as someone who is easy to cheat. One of the ways that "jacking" occurs is when a person goes to the dealer on the street and asks for cocaine. The dealer asks to see the money first. When the buyer produces the money, the "dealer" grabs the money and runs. There are also situations where a buyer has too large a bill to give the exact change. In a situation like that, the "dealer" may just take the additional money, pull his gun, and rob the buyer of the money and whatever else the buyer has.

LeCesne testified that in the area of the apartment complex, nine times out of ten drug dealers were armed. On cross-examination, LeCesne admitted that he knew nothing about the particular facts and circumstances of this case. He also said that people who sell drugs are often targets for robbery as well.

Simeon Dillard testified that appellant was his uncle. Appellant's street name was Pork Chop. On February 16 and 17, 1994, Simeon was at the Diamond Ridge Apartments. Shortly after midnight, Simeon was in one of the apartments when one of the other occupants told him that "Pork Chop was fighting." Simeon peeked out the door and saw a fight. Others in the apartment said they heard a gunshot. Simeon gave a statement to a Detective Marshall. Simeon admitted that he had told police that the man he had seen fighting with appellant hit him in the face. Simeon identified State's Exhibit No. 16 as a sworn affidavit he gave to Detective Marshall. Simeon admitted that this statement said that he had seen appellant and Paxton fighting when appellant pulled a semi-automatic pistol from the waistband of his pants and shot Paxton. Simeon testified that appellant made his money by selling drugs. He also said that appellant owned a pistol. On cross-examination, Simeon said that the officer wrote the statement identified as State's Exhibit No. 16. State's Exhibit No. 16 was actually the third statement that had been written by the detective after Simeon had told him the first two were not correct. Simeon testified that the detective told him he had to sign it. On redirect examination, Simeon admitted that what the detective actually told him was that, even though appellant was his uncle, he had "to do the right thing."

Carlton Marshall, a detective with the Dallas Police Department, testified that on February 17, 1994 he was called to investigate Paxton's shooting. At the scene, he spoke

with Allen, the security guard, and some of the patrol officers who gave him a rundown on what they understood had occurred. He obtained the property records at Baylor Hospital, where Paxton had been taken, to see what belongings were on him. Paxton's wallet was not on his person and was never located. No form of ID or money was found. Marshall showed Allen some photographic lineups shortly thereafter. Allen identified a photograph from the lineup as Antywon Dillard. Marshall also spoke with Dabbs and showed him a lineup. Dabbs made a tentative identification in one lineup, saying that the photograph looked like the person he saw on the night of the shooting. In the second lineup, Dabbs picked out a photograph as looking like the shooter; however, Dabbs was not sure.

Later, Marshall spoke with Simeon Dillard in his home. Simeon made a statement to Marshall at that time. He did not coerce, threaten, or do anything else of that nature to have Simeon sign or swear to the truth of the affidavit. Marshall said that Simeon told him that after the shooting, appellant threw him the gun. Simeon threw the gun back to appellant and ran up to the apartment.

After Marshall interviewed Simeon, he met with appellant, who was under arrest at that time. Appellant was given his *Miranda* [3] warnings. Appellant did not indicate that he wanted to consult a lawyer. Appellant indicated that he understood his rights. Marshall testified that he did not use any means of force or threats in order to obtain a statement from appellant, nor did he promise appellant any reward or benefit. After the statement was admitted into evidence, Marshall read the statement to the jury. In his statement, appellant said he had sold the man two dime bags of crack. The man paid him and left. Shortly afterwards, the man returned, said "The dope wasn't right" and demanded his money back. The men began fighting. According to appellant, Paxton hit him in the face, and appellant ran. Paxton caught appellant and the two men began wrestling. During their struggle, Paxton grabbed the gun which was in appellant's waistband and pulled it out. The men wrestled over the gun until it went off. Appellant retrieved the gun and ran away. Approximately twenty minutes before appellant began giving his statement, he told Marshall that he was not even at the site of the shooting.

On cross-examination, Marshall testified that after speaking with Allen, Marshall originally focused on Antywon Dillard as the prime suspect. Marshall filed a case against Antywon at that time. Antywon, together with his attorney, met with Marshall. Antywon denied committing the offense and directed Marshall to other avenues of investigation. Marshall then spoke with Simeon Dillard. Marshall described Simeon's recall as "scattered." When defense counsel asked Marshall if he was simply interpreting what Simeon said as opposed to writing it down verbatim, Marshall said counsel's characterization was inaccurate.

Juan Luis Zamora, a medical examiner with Dallas County, testified that he performed an autopsy on Paxton's body. Zamora testified that the ribs, the right lung, and the liver were hit by the bullet, which entered at Paxton's right shoulder. The bullet was lodged in the lower part of the abdominal wall. The State asked the court to take notice that appellant stood taller than 5'9". Zamora testified that Paxton was approximately 5'5" tall. The bullet entered Paxton below the collarbone. Zamora testified that in order for Paxton's wound to be consistent with the medical findings, the gun would have had to be between one and three feet away when it was fired at Paxton. Zamora also testified that whenever a person dies from any form of violence, and especially when a firearm is involved, the medical examiner requests that the hands be covered with paper bags to preserve any evidence that might be obtained. A handwiping is conducted during the postmortem examination. Wipings were performed on Paxton. The results of the handwiping did not show any evidence of gunshot residue.

On cross-examination, Zamora admitted he had no personal knowledge of how the offense occurred. In addition, he testified that

---

3. See *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

it was possible the deceased could have ingested cocaine as much as two hours prior to his death.

John Nichols testified that he knew appellant made his money by selling cocaine. On the day after the shooting, Nichols saw a news story saying that appellant was wanted for murder. After Nichols saw the program, he saw appellant and asked him about the shooting. Appellant told Nichols that Paxton tried to take his gun but then shot himself in the hand. Nichols testified that appellant used a nine millimeter semi-automatic pistol. On cross-examination, Nichols admitted he was being held on unrelated capital murder charges. He testified that he sometimes sold drugs in the area of Diamond Ridge Apartments.

Lanny G. Emmanuel, a firearm and tool mark examiner with the Southwestern Institute of Forensic Sciences, testified that he examined both a bullet that was removed during Paxton's autopsy and a nine millimeter cartridge case submitted by the police department. He testified that both the cartridge case and the bullet came from a nine millimeter weapon.

## SUFFICIENCY

█ In analyzing the legal sufficiency of the evidence, this Court limits its inquiry to determining whether, examining the evidence in the light most favorable to the verdict, any rational trier of fact could have found the elements of the offense beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *Vuong v. State,* 830 S.W.2d 929, 933 (Tex.Crim.App.), *cert. denied,* 506 U.S. 997, 113 S.Ct. 595, 121 L.Ed.2d 533 (1992). The trier of fact is the sole judge of the credibility of the witnesses and the weight to be given their testimony. *Bonham v. State,* 680 S.W.2d 815, 819 (Tex.Crim.App.1984), *cert. denied,* 474 U.S. 865, 106 S.Ct. 184, 88 L.Ed.2d 153 (1985).

█ In analyzing whether the evidence was factually sufficient to support the conviction, we must view all the evidence, but not "in the light most favorable to the prosecution," and we set the verdict aside only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *See Clewis v. State,* 922 S.W.2d 126, 129 (Tex.Crim.App.1996). In conducting this analysis, the courts are not free to reweigh the evidence and set aside a jury verdict merely because the judges feel that a different result is more reasonable. *Id.* at 135 (quoting *Pool v. Ford Motor Co.,* 715 S.W.2d 629, 634 (Tex.1986)). Rather, the purpose of this analysis is to allow an appellate court, in exercise of its fact jurisdiction, to prevent a manifestly unjust result. *Id.* A court reversing on factual insufficiency grounds should detail the evidence relevant to the issue in consideration and clearly state why the jury's finding is factually insufficient. *Id.* (quoting *Meraz v. State,* 785 S.W.2d 146, 154 n. 2 (Tex.Crim.App.1990)).

### A. Intent

█ In his first point of error, appellant contends the evidence was insufficient to prove a specific intent to kill. In order to convict of capital murder, the evidence must show that the defendant had the specific intent to kill. *See Rousseau v. State,* 855 S.W.2d 666, 673 (Tex.Crim.App.), *cert. denied,* 510 U.S. 919, 114 S.Ct. 313, 126 L.Ed.2d 260 (1993). The evidence in this case showed that appellant took $100 from Paxton, then, after having Paxton return cocaine to him, ran into the apartment complex with Paxton's money. Paxton was found shot in the shoulder with appellant running away. Appellant was seen with a handgun at the time of the incident. Dr. Zamora testified that Paxton's wound was consistent with a gunshot fired from one to three feet away. A firearm is a deadly weapon per se. TEX.PENAL CODE ANN. § 1.07(a)(17)(A) (Vernon 1994); *Gomez v. State,* 685 S.W.2d 333, 336 (Tex.Crim.App.1985). The use of a deadly weapon in a deadly fashion allows an inference that the defendant intended to kill. *Staley v. State,* 887 S.W.2d 885, 889 (Tex. Crim.App.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 1366, 131 L.Ed.2d 222 (1995).

█ Appellant contends that the evidence showed that Paxton was shot during a struggle over the gun. Apparently, appellant's argument is that we should credit his volun-

tary statement to the police as conclusive evidence of what occurred at the time of the shooting. This we cannot do. First, the State is not bound by exculpatory evidence in a voluntary statement. *See Russeau v. State,* 785 S.W.2d 387, 390 (Tex.Crim.App. 1990). Moreover, appellant's voluntary statement was contradicted by the forensic evidence presented when Dr. Zamora testified that his tests showed the gunshot wounds were consistent with the gun being fired from one to three feet away from Paxton. The jury not only could have rationally concluded that Dr. Zamora's forensic testimony was more credible than appellant's self-serving statements, it could reasonably have made this conclusion. Even in a factual sufficiency context, the jury is the judge of the credibility of witnesses. *See Williams v. State,* 848 S.W.2d 915, 917 (Tex.App.—Texarkana 1993, no pet.). We conclude that the evidence is both legally and factually sufficient to establish that appellant had the specific intent to kill. *Cf. Turner v. State,* 805 S.W.2d 423, 427 (Tex.Crim.App.) (forensic testimony sufficient to show intent to kill despite appellant's version that shooting occurred during close struggle over weapon), *cert. denied,* 502 U.S. 870, 112 S.Ct. 202, 116 L.Ed.2d 162 (1991). We overrule appellant's first point of error.

## B. Murder committed in the course of robbery

■ In his second point of error, appellant contends that the evidence, at most, established that he killed Paxton in the course of committing theft, not robbery. The indictment alleged that appellant intentionally caused Paxton's death "while the said defendant was in the course of committing and attempting to commit the offense of robbery of deceased...." *See* TEX.PENAL CODE ANN. § 19.03(a)(2) (Vernon 1994). The jury charge authorized conviction if the jury found beyond a reasonable doubt that appellant caused Paxton's death in the course of committing or attempting to commit the offense of robbery. As long as the intent to rob is formed before the murder, the offense of capital murder is complete. *See Robertson v. State,* 871 S.W.2d 701, 705 (Tex.Crim.App. 1993), *cert. denied,* —— U.S. ——, 115 S.Ct.

155, 130 L.Ed.2d 94 (1994); *Garrett v. State,* 851 S.W.2d 853, 856 (Tex.Crim.App.1993).

■ Appellant argues that the evidence was insufficient to show that he committed theft. It is not necessary to prove a completed theft in order to prove the offense of robbery unless the State elects to allege in the indictment that a completed theft occurred. *See Wolfe v. State,* 917 S.W.2d 270, 275 (Tex.Crim.App.1996). The evidence in this case showed that appellant took $100 from Paxton for drugs. When Paxton decided he did not want to complete the sale, appellant asked for his drugs back, then ran from the scene with Paxton's money. If the intent to deprive the deceased of his property was formed before the murder occurred, the evidence will support a conclusion that the murder occurred in the course of robbery. *See Zimmerman v. State,* 860 S.W.2d 89, 93 (Tex.Crim.App.), *vacated on other grounds,* 510 U.S. 938, 114 S.Ct. 374, 126 L.Ed.2d 324 (1993). We conclude that the evidence was sufficient to show a theft.

Appellant argues that there is no evidence that the deceased received bodily injury in a scuffle, or that he was threatened with or placed in fear of bodily injury or death. However, in order to prove the offense of capital murder, the State need not prove a completed robbery. It need only show that an intent to rob was formed prior to the murder. *Robertson,* 871 S.W.2d at 705. Moreover, the State need only show that the murder occurred in the course of or during an attempted robbery. *See* TEX.PENAL CODE ANN. § 19.03(a)(2) (Vernon 1994). The Court of Criminal Appeals has defined this element as requiring a showing that the defendant committed the murder in an attempt to commit, during the commission, or in immediate flight after the attempt or commission of robbery. *See Bower v. State,* 769 S.W.2d 887, 895 (Tex.Crim.App.), *cert. denied,* 492 U.S. 927, 109 S.Ct. 3266, 106 L.Ed.2d 611 (1989), *overruled on other grounds by Heitman v. State,* 815 S.W.2d 681 (Tex.Crim.App. 1991).

Dabbs testified that appellant took Paxton's money and ran. Paxton ran after him. The struggle between Paxton and appellant

showed appellant's unlawful attempt to inflict bodily injury in order to retain the money he had stolen from Paxton. The attempt to inflict bodily injury may be made in immediate flight from a theft in order to prove the injury element of robbery. *See* TEX.PENAL CODE ANN. § 29.01(1) (Vernon 1994).

 Appellant also argues that the evidence conclusively shows that, even if there was a struggle with Paxton, appellant simply acted in self-defense. However, an individual may act in self-defense when and to the extent he reasonably believes the force is immediately necessary to protect himself against the other's use or attempted use of unlawful force. TEX.PENAL CODE ANN. § 9.31(a) (Vernon 1994). The use of force against another is not justified if the actor provoked the other's use or attempted use of unlawful force, unless (A) the actor abandons the encounter, or clearly communicates to the other his intent to do so reasonably believing he cannot safely abandon the encounter; *and* (B) the other nevertheless continues or attempts to use unlawful force against the actor. TEX.PENAL CODE ANN. § 9.31(b)(4) (Vernon Supp.1996). Generally, a person committing the offense of robbery has no right of self-defense against his intended victim. *See Davis v. State,* 597 S.W.2d 358, 360 (Tex.Crim.App.), *cert. denied,* 449 U.S. 976, 101 S.Ct. 388, 66 L.Ed.2d 238 (1980). Far from conclusively showing that appellant acted in self-defense, the evidence shows that appellant stole money from Paxton, then shot Paxton following a struggle. A jury could have reasonably concluded that appellant initiated the assaultive conduct.

In challenging the factual sufficiency of the evidence as to this element, appellant points out that Dabbs's testimony that Paxton was trying to recover his money from appellant was in conflict with Allen's testimony that he had seen Paxton twice in the area. Thus, appellant argues, Paxton was not an unwitting victim of a theft. Appellant characterizes Dabbs's testimony as "inherently incredible." First, it is not clear that the testimony of the two witnesses is irreconcilably in conflict. Allen testified he saw Paxton in the vicinity of the Diamond Ridge Apartments twice over two days. We are not willing to stretch this testimony so far as to say that an individual, by standing in front of an area of known drug sales, could not decide to rescind a drug sale when the seller began behaving oddly. But even if the testimony conflicted, the jury is the judge of the credibility of witnesses in a factual sufficiency analysis. *See Williams,* 848 S.W.2d at 917. Thus, we find appellant's argument without merit.

We conclude that the jury could rationally have concluded that the evidence showed that appellant formed the intent to rob before he committed the murder. Further, we cannot say that the jury's verdict is so against the overwhelming weight and preponderance of the evidence as to be clearly wrong and unjust. We overrule appellant's second point of error.

## EVIDENCE OF EXTRANEOUS OFFENSE

In his third point of error, appellant contends that the trial court committed reversible error by refusing to declare a mistrial after the State elicited testimony concerning extraneous offenses. During Charles Allen's testimony he made reference to seeing some of appellant's family members in the area of the apartment complex saying "I seen them again over in my back section and I called the police but I think they was in a stolen car." Appellant objected, saying "Your Honor, I'm going to object to that." The court sustained the objection, ordered the jury to disregard, but denied the motion for a mistrial. Appellant now argues that the evidence stricken by the judge constituted inadmissible and incurable evidence of an extraneous offense.

 In order to preserve error, a defendant must make a specific objection. *See* TEX.R.APP.P. 52(a). Without a specific objection, we cannot tell what the court was ruling on or whether the court was aware of the grounds upon which the objection was made. Thus, we cannot review the correctness of the court's ruling. *Cf. Hougham v. State,* 659 S.W.2d 410, 414 (Tex.Crim.App. [Panel Op.] 1983) (objection, "We object to this line of argument, Your Honor," too general to preserve error for review).

Even if we assume that the objection and the ruling pertain to the introduction of an extraneous offense, we would not find the introduction of the evidence to constitute reversible error. Appellant may be correct in his assertion that the proffered evidence constituted an inadmissible extraneous offense. *See Couret v. State,* 792 S.W.2d 106, 107 (Tex.Crim.App.1990) (extraneous offense should relate in some way to the underlying offense). However, the court sustained appellant's objection and instructed the jury to disregard. A prompt instruction to disregard generally cures an improper reference to an extraneous offense. *See Fuller v. State,* 827 S.W.2d 919, 926 (Tex.Crim.App. 1992), *cert. denied,* 509 U.S. 922, 113 S.Ct. 3035, 125 L.Ed.2d 722 (1993). Appellant does not present any argument as to why the error in introducing this evidence could not have been cured by an instruction to disregard. Further, we find nothing in the evidence which would lead us to conclude that the error, if any, could not have been cured by the court's instruction to disregard. We conclude that, even assuming that Allen's testimony was inadmissible, the court's instruction to disregard cured any harm. We overrule appellant's third point of error.

### EVIDENCE OF HANDWIPING TEST

In his fourth point of error, appellant contends that the trial court committed reversible error by allowing the introduction of results of a handwiping test performed on the deceased's hands. Dr. Zamora testified that, during all cases where someone dies by violence, the medical examiner's office performs a routine handwiping test. Zamora also testified that he was the custodian of the records at the Southwest Institute of Forensic Sciences. Zamora testified that the handwiping report was a business record of the Southwest Institute. On voir dire, Zamora testified that he had experience in doing handwipings. He said that he could testify as to the procedure and methods used by Vicki Hall, the technician who conducted the test. He knew the process she used to perform the test, and he knew how she reached the results. He admitted he was not present when Hall performed the test, and thus had no knowledge whether she performed the test properly or improperly. When the State offered the report into evidence, appellant objected to the introduction of the record because he could not cross-examine the person who ran the analysis. The court overruled the objection and the evidence was admitted.

The trial court is the institutional arbiter of whether hearsay is admissible under exceptions to the general rule of exclusion of such testimony under rule 802 of the Texas Rules of Criminal Evidence. *Coffin v. State,* 885 S.W.2d 140, 149 (Tex.Crim.App. 1994). Whether evidence comes in under one of the exceptions to the hearsay rule is a question for the trial court to resolve, reviewable for abuse of discretion. *Id; see Montgomery v. State,* 810 S.W.2d 372, 390 (Tex. Crim.App.1991) (op. on reh'g). The appellate court should not conduct a *de novo* review; its role is limited to determining whether the record supports the trial court's ruling. *Coffin,* 885 S.W.2d at 149.

One exception to the hearsay rule is provided in rule 803(8) of the Rules of Criminal Evidence. Rule 803(8) reads as follows:

**(8) Public Records and Reports.** Records, reports, statements, or data compilations, in any form, of public offices or agencies setting forth (A) the activities of the office or agency, or (B) matters observed pursuant to duty imposed by law as to which matters there was a duty to report, excluding, however, matters observed by police officers and other law enforcement personnel or (C) against the State, factual findings resulting from an investigation made pursuant to authority granted by law; unless the sources of information or other circumstances indicate lack of trustworthiness.

Southwest Institute of Forensic Sciences performed its handwiping analysis at the request of the medical examiner's office. As such, it was acting as an agent of the medical examiner, not as an agent of police or other law enforcement officials. The Court of Criminal Appeals has already held that, as a general rule, a medical examiner's office is not considered "other law enforcement personnel" under rule 803(8)(B) of the

rules of criminal evidence. *Garcia v. State,* 868 S.W.2d 337, 342 (Tex.Crim.App.1993).

We conclude that the trial court did not abuse its discretion in admitting into evidence the handwiping analysis report performed by the Southwest Institute of Forensic Sciences at the request of the medical examiner's office. We overrule appellant's fourth point of error and affirm the judgment of the trial court.