**AFFIRM; and Opinion Filed January 24, 2018.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-17-00124-CR

**PATRICK LYNN RUSSELL, Appellant**
**V.**
**THE STATE OF TEXAS, Appellee**

**On Appeal from the 292nd Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. F-1600779-V**

## MEMORANDUM OPINION
Before Justices Lang-Miers, Fillmore, and Stoddart
Opinion by Justice Lang-Miers

Appellant was convicted of capital murder and sentenced to life imprisonment without the possibility of parole. He appeals raising five issues: (1) whether the evidence was sufficient to disprove that he killed Tavares Tell in self-defense, (2) whether the evidence was sufficient to disprove that he killed Kenny Garcia in self-defense, (3) whether the evidence was sufficient to prove that the murder was committed during the course of robbery or attempted robbery, (4) whether the trial court erred and he suffered egregious harm because the court did not instruct the jury that self-defense applies to robbery, and (5) whether the trial court's jury charge authorized a non-unanimous capital murder verdict. We affirm.

## Background

On September 5, 2013 Tavares Tell, a/k/a "Black," and Kenny Garcia, were shot to death while sitting in a parked car at an east Dallas apartment complex in an apparent "drug deal gone bad." Earlier that day, appellant and three accomplices – his brother Charles (a/k/a Carl) Russell, Dewen Knight and Tevynn Boone[1] – drove to Dallas in a borrowed red Nissan Versa from Shreveport, Louisiana with the purported purpose of purchasing 9 ounces of cocaine for $8000 from Tell. All four accomplices were ultimately charged with the deaths of Tell and Garcia. Only Boone testified at trial.

### *Setting Up the Drug Transaction*

Appellant had previously told Boone that he wanted a good price on some drugs. Boone told appellant that he knew where to get some. Boone had recently lived in the Dallas area and had some working knowledge of the "Dallas cocaine scene." Boone had sold drugs in the Dallas area and had also purchased drugs from Tell, a low level drug dealer selling mainly marijuana and cocaine. Appellant told Boone "whenever we get a ride, we'll go down there and pick it up."

Knight arranged to borrow a friend's red Nissan Versa. He told her that he was going to DeBerry, Texas with appellant and Russell and that he would be back.

Appellant called Boone and told him that he had obtained a vehicle to take them to Dallas. Appellant picked Boone up at his house. They, along with Knight and Russell, left Shreveport about 5:00-5:30 p.m. Boone knew that the drive to Dallas takes between 2 hours and 2 hours and

---

[1] Appellant's brother Charles a/k/a Carl Russell will be referred to in this opinion as Russell.

15 minutes. Boone both called and sent text messages to Tell to arrange the drug transaction during the drive.

On the way to Dallas, appellant, who was driving the borrowed car, stopped at a travel center off Interstate 20 near Canton, Texas. A photograph taken of Russell and Knight at that location showed Russell holding a handgun with an extended magazine on the clip; the extension would give the gun more "capacity" for bullets.[2] Russell was wearing a white t-shirt and Knight had on a red baseball cap with the letter "A." This photograph was later recovered by the police during a "dump" of Russell's cell phone.

Boone saw appellant with some money when appellant paid for the gas at the travel center but he did not know how much money appellant had and it did not appear to be a large amount of money. Boone, however, was not worried about the money because appellant had never given him a "bad impression on money." For his role in this transaction, appellant was going to take Boone to check on his sick mother and give him some money, which Boone thought would probably be a few hundred dollars.

Once they arrived in the Dallas area, the four accomplices went to the Oats Creek Apartments in Mesquite, Texas, where Boone had previously lived. They were supposed to meet Tell there. When Boone called Tell to say that they had arrived, Tell said he was at his son's football game. They waited for about three hours before re-connecting with Tell.

### Circumstances Leading to the Shootings

During the time when Boone was calling and texting, Tell's roommate, Chris Mutz, noticed that Tell had been acting "really weird." He said "These guys keep calling me, keep calling me."

---

[2] According to the lead detective, the extension gives this weapon "a bigger count on how many rounds you can actually fire."

Prior to leaving his home, Tell told Mutz to "stay home and wait for his call if he ran into some trouble." Tell left the house about 10:00 p.m. He had ingested cocaine earlier and was "really antsy, nervous, kind of anxious." Tell was known to have a .9 millimeter Glock pistol.

Tell met up with the four accomplices on Interstate 635 in traffic around 10:00 p.m. Boone was now driving the borrowed car. Appellant and his accomplices were to follow Tell to some apartments in East Dallas because Tell did not have the full amount of the drugs appellant wanted to buy and needed to procure more.

The accomplices followed Tell from Interstate 635 to Interstate 30, exiting on East Grand. They continued to follow Tell to a neighborhood where Tell pulled over to the side of the road. Boone got out the car and went to Tell's car; Tell asked Boone if they wanted to continue to follow him or have appellant get in Tell's car. Appellant got in Tell's car and, with Boone driving the borrowed Versa, they continued to follow Tell to some apartments. On the way to the apartments, another person, subsequently identified as Kenny Garcia, got in the back seat of Tell's car. Boone had never seen Garcia before. Garcia kept a Glock firearm and was into some "bad stuff," *i.e.*, selling drugs.

### The Shootings

Once at the apartment complex, Tell pulled into a parking spot; Boone followed, parking about two spots away from Tell. At some point Russell, who had been in the back seat of the Versa with Knight, got out of the car and walked over to Tell's car. He was gone 15-20 minutes. Boone occupied himself by scrolling through his phone. He looked over a few times and saw Tell and Boone's accomplices laughing and "stuff like that." It seemed to Boone like everything was good.

Russell got into the backseat of Tell's car and about thirty seconds later Boone heard a gunshot. Boone started the car, and was pulling it around when he heard a series of gunshots. He

could not really say how many, but it was more than five. About thirty seconds or so later, he heard another series of gunshots, possibly six or seven.

### *Flight from the Scene*

When Boone pulled the car around in the parking lot to try to get out, Russell ran back to the car. Russell was holding his stomach, had blood on his shirt, and was asking to be taken to the hospital. It was clear that he had been shot. Russell got into the passenger seat of the Versa. After about thirty seconds or so there were another series of gunshots. Then appellant jumped in the car and said that Boone had to get his little brother to the hospital. Appellant had a balled up white t-shirt with him.

Boone did not want to take Russell to either Baylor or Parkland because he thought they were too close to the apartments but wanted to get Russell to a hospital off the George Bush turnpike. Instead of taking Russell to a hospital, they dropped off Russell and Knight at a gas station at Jupiter and Interstate 635. Knight volunteered to stay with Russell and Knight ran in and called 911.

Boone drove appellant back to Shreveport where they arrived between midnight and probably closer to 1:00 a.m. They rode primarily in silence. When Boone asked appellant what happened, appellant said "he shot my little brother." Appellant also told Boone that he and Tell had struggled over the firearm and that appellant was able to disarm Tell and use his own gun against him. Boone saw what looked like two black guns in the rolled up t-shirt. Boone did not know what became of those guns.

Boone assured appellant that he would keep his mouth shut and they went their separate ways. Boone had never been in a situation like this before and he was scared of both appellant and of the police.

Appellant returned the borrowed car to its owner in Shreveport about 2:00 a.m., telling her that his brother had been shot.

*Police Response and Investigation*

Two women who both lived either at or near the apartment complex heard the gunshots and called 911. One woman saw a young man wearing a white t-shirt; he was bending over and said he was shot. Both women described the gunfire as sporadic, with pauses between groups of shots.

Dallas police officer William McCluskey responded to the shooting call at the apartment complex about 11:00 p.m. Tell was in the driver's seat and Garcia was in the back passenger side seat of a black Ford Focus. They had both sustained multiple gunshot wounds. Tell was dead. Garcia was transported to a hospital by paramedics and later pronounced dead.

The officer saw that Tell's seat was reclined back. His phone was in his lap and his shoes were on the floorboard next to his feet. It was apparent that there had been a big gun battle because there were fired casings all around the car and live rounds on the ground. It was later determined that at least three guns had been involved.

The front driver's seat had cocaine residue. A piece of what ultimately proved to be rock cocaine weighing 42.30 grams was found under Tell's body. Cocaine in an amount of approximately 28.2 grams was found in Garcia's pocket at the hospital. The police believed these amounts were indicative of drug transactions. In the lead detective's opinion, it would take a lot of money to buy this large amount of drugs. The presence and amount of the drugs confirmed in the detective's mind that a drug transaction was occurring at the time the shooting took place.

A Glock .9 millimeter firearm was found on the right rear floorboard of the vehicle near where Garcia had been sitting. From this, the police concluded that Garcia had been armed. Also found in the car was a recoil spring from a Glock firearm and an unfired bullet; this indicated to

the police that the gun may have malfunctioned, though it was later found to be mechanically functional. It was subsequently determined that six cartridge cases were fired by this gun. Nine cartridge cases were all fired from the same gun, but not from the recovered Glock. Eight more cartridge cases were fired from the same gun, but not from the recovered Glock or from the gun which had fired the nine cartridge cases.

While the Dallas police were working the shooting scene at the apartment complex, a call came out that the Garland police had reported a gunshot victim and another individual at the parking lot of a 7-Eleven on Shiloh and LBJ. The gunshot victim was Russell, appellant's brother. There were reports that a small red car dropped Russell off along with another man, Knight, who was wearing the same red baseball cap with an "A" as he had worn in the photograph taken with Russell that showed the gun with the extended clip. Both Russell and Knight were arrested. Knight subsequently tested negative for gunshot residue on his hands.

It was later determined that the cause of death for Tell and Garcia was multiple gunshot wounds. Tell suffered twelve different gunshot wounds while Garcia had eight different gunshot wounds.

Both Tell and Garcia tested positive for gunshot residue. These results indicated that they either fired a firearm, were in the vicinity of the firearm when it was fired, or that they handled a firearm or firearm component that was previously fired or had gunshot residue on it. None of Tell's wounds had any stippling, which could mean either that there was something interposed between Tell and the gun, or that the gunshots were fired at a distance of more than three feet. Only one of Garcia's wounds had very sparse stippling, indicating a close proximity to the gun which shot him.

No drugs or alcohol were found in Garcia's body. Tell's toxicology test results were positive for cocaine and substances indicating marijuana use. The levels of cocaine were consistent

with use in the hours prior to his death. Because marijuana has a very long half-life, however, it could not be determined if Tell had used marijuana that day or several days prior to the shooting.

Tell's car was processed for both fingerprints and DNA. Some of the fingerprints from Tell's car were identified as appellant's. Specifically, six of appellant's fingerprints prints were found in various places on the exterior passenger side of Tell's car. Appellant was also a contributor of some of the DNA found in Tell's car.

The owner of the red Versa later learned that her car may have been involved in this shooting. She contacted the detective in charge, telling him that it was appellant who had returned her car to her. The Versa was processed for evidence. The car tested positive for the presence of blood.

### *Statements Appellant Made in Jail*

Jeffrey Arrington, an inmate with the Dallas County jail, had a conversation with appellant in which appellant asked Arrington what the difference was between physical evidence and circumstantial evidence; he was worried about "the fingerprints." Arrington knew appellant was referring to his "case of capital murder during the commission of an aggravated robbery." Arrington also claimed to have heard appellant make the following remarks: "I should have whacked the bitch while I had the chance;" and "Damn, if I would have gotten rid of the hoe, I wouldn't be sitting here now." Appellant also talked about how he was going to "have to take care of his business in East Dallas and cap a hoe because of the disrespect."

### **Rejection of Self-Defense**

In issues one and two, appellant challenges the sufficiency of the evidence to support the jury's implied rejection of his claims of self-defense regarding the homicides of Tell and Garcia. The jury was charged on the law of self-defense and the self-defense theory was argued by both

the prosecutor and by defense counsel during final jury argument. By returning a verdict of guilty on the charge of capital murder, the jury impliedly rejected the self-defense theory.

A person commits capital murder if he intentionally or knowingly commits murder and murders more than one person during the same criminal transaction. TEX. PENAL CODE § 19.03(a)(7)(A). Capital murder is also committed if a person intentionally commits murder during the course of committing or attempting to commit robbery. TEX. PENAL CODE § 19.03(a)(2). Appellant does not challenge the sufficiency of the evidence to support the jury's finding of the essential elements of the murder portion of the offense beyond a reasonable doubt. Instead, he challenges the sufficiency of the evidence to support the jury's rejection of his self-defense claim.

*Self-Defense*

A person is justified in using deadly force against another (1) if he would be justified in using force against that person under Section 9.31, and (2) when and to the degree he reasonably believes the deadly force is immediately necessary to protect himself against the other person's use or attempted use of unlawful deadly force. TEX. PENAL CODE §§ 9.31(a), 9.32(a). "Deadly force" means "force that is intended or known by the actor to cause, or in the manner of its use or intended use is capable of causing, death or serious bodily injury." TEX. PENAL CODE § 9.01(3).

A defendant is not required to testify in order to raise the issue of self-defense; rather, the issue may be raised by the testimony of witnesses who testify to the defendant's acts and words at the time of the offense. *Reed v. State,* 703 S.W.2d 380, 384–85 (Tex. App. – Dallas 1986, pet. ref'd) (*citing Smith v. State,* 676 S.W.2d 584, 587 (Tex. Crim. App.1984)). Evidence from any source may raise the defensive issue of self-defense. *See Mendoza v. State*, 88 S.W.3d 236, 239 (Tex. Crim. App. 2002).

When some evidence raising the issue of self-defense is produced, the State bears the burden of persuasion to show beyond a reasonable doubt that the defendant's actions were not

–9–

justified. *Zuliani v. State*, 97 S.W.3d 589, 594 (Tex. Crim. App. 2003); *Saxton v. State*, 804 S.W.2d 910, 913 (Tex. Crim. App. 1991). The State does not bear a burden of production to affirmatively produce evidence refuting a self-defense claim; rather, the State is required to prove its case beyond a reasonable doubt. *Saxton*, 804 S.W.2d at 913. A jury impliedly rejects a claim of self-defense by finding a defendant guilty. *Id*. at 914; *see also Zuliani*, 97 S.W.3d at 594.

When, as here, an appellant challenges the legal sufficiency of the evidence to support the jury's implied rejection of his self-defense claim, this Court looks not to whether the State presented evidence which refuted appellant's self-defense theory, but rather determines, after viewing all the evidence in the light most favorable to the prosecution, whether any rational trier of fact would have found the essential elements of murder beyond a reasonable doubt and also would have found against appellant on the self-defense issue beyond a reasonable doubt. *Saxton*, 804 S.W.2d at 914; *see also Jackson v. Virginia*, 443 U.S. 307, 318–19 (1979); *Smith v. State*, 355 S.W.3d 138, 145 (Tex. App. – Houston [1ˢᵗ Dist.] 2011 pet. ref'd) (applying the *Jackson v. Virginia* standard to jury's rejection of self-defense claim). In conducting a legal sufficiency review, this Court defers to the jury's assessment of the credibility of the witnesses and the weight to be given their testimony. *Brooks v. State*, 323 S.W.3d 893, 899 (Tex. Crim. App. 2010).

### Jury Properly Rejected Self-Defense

Appellant did not testify at trial, nor did he present any defensive evidence. There was no admission by appellant of his involvement in this case. Any evidence of self-defense came from the State's witnesses, particularly from Boone, an accomplice.

Boone testified that, when he asked appellant what happened on the drive back to Shreveport, appellant told him that Tell went for his gun and appellant tried to grab it from him and that is when the shooting started. The two men struggled over the gun but appellant was able

to disarm Tell. The jury could reasonably infer that appellant then used Tell's gun against Tell and Garcia.

Appellant's connection to the scene of the shooting, and to Tell's car, was firmly established. Boone placed appellant in Tell's car at the scene of the shooting and leaving the scene of the shooting with two guns concealed in a t-shirt. Even without Boone's testimony, however, appellant was connected to the scene of the shooting because his fingerprints were on Tell's car and he was identified as a contributor of DNA tested in Tell's car. Although a defendant's mere presence at the scene of the crime is, by itself, insufficient evidence to establish guilt, his presence combined with other suspicious circumstances may be sufficient to connect the defendant to the crime. *Dowthitt v. State*, 931 S.W.2d 244, 249 (Tex. Crim. App. 1996); *Cox v. State*, 830 S.W.2d 609, 611 (Tex. Crim. App. 1992). Similarly, while mere presence is insufficient to corroborate the testimony of an accomplice, combined with other suspicious circumstances it may be sufficient corroboration. *Smith v. State*, 332 S.W.3d 425, 442-43 (Tex. Crim. App. 2011). The physical evidence in this case both established appellant's presence in and/or around Tell's car and also served to corroborate Boone's testimony.

The probable absence of a large amount of cash also serves to support the jury's rejection of self-defense. Boone never saw $8000, the agreed upon price for the amount of cocaine to be exchanged. While he saw some money in appellant's possession at the time appellant paid for the gas at the travel center in Canton, he did not believe it was a large amount of money. The absence of sufficient funds to complete the drug transaction indicates that appellant went to meet Tell without the intention of fulfilling his part of the bargain to pay for the drugs. This is particularly true since appellant had drug connections in Shreveport. It is a reasonable inference that appellant did not need a drug supplier in Dallas and set up the transaction with the intent to commit either theft or robbery.

Defense counsel argued that Boone testified that none of the occupants of the borrowed car had guns and suggested that both Tell and Garcia, on the other hand, had guns which compelled consideration of self-defense. But arguments of counsel are not testimony. *Banda v. Garcia,* 955 S.W.2d 270, 272 (Tex. 1997) (holding unsworn attorney statements generally do not constitute evidence); *Lee v. State*, 442 S.W.3d 569, 579 (Tex. App. – San Antonio 2014, no pet.). And the evidence showed that appellant's brother, Russell, and Knight were photographed at a travel center outside of Dallas with a Glock firearm with an extended magazine. It is a reasonable inference from this evidence that appellant and his accomplices came from Louisiana armed and went to the drug transaction with bad intentions, such as committing theft or robbery.

Appellant also argues in support of his position that the police were of the opinion that there was no way to determine who shot first in this case. But knowing who fired the first shot in the course of the gun battle is not essential to resolving these issues against appellant. The shots fired were sporadic; there was one shot fired followed by a pause, a group of shots fired followed by a pause, followed by yet another group of shots. The self-defense statute provides that the use of deadly force is justified only when a person's life is *immediately threatened* by another's use of unlawful deadly force. *Kelley v. State*, No. 05-15-00545-CR, 2016 WL 1446147, at *7 (Tex. App. – Dallas April 12, 2016, pet. ref'd) (not designated for publication); *Wilson v. State*, No. 06-14-00021-CR, 2014 WL 8332264, at *6 (Tex. App.–Texarkana November 7, 2014, pet. ref'd) (not designated for publication). The jury could reasonably infer that the sequence in which the shots were fired does not reflect a situation of immediate necessity from start to finish. Additionally, the jury could also reasonably infer that the sheer number of bullets that were fired – Tell was shot twelve times and Garcia was shot eight times – are beyond what can be considered immediately necessary to protect appellant from any action taken by either Tell or Garcia.

The police surmised that Garcia shot the recovered Glock because the gun was still in Tell's car, close to Garcia, and was determined to have fired six shots. It was the lead detective's belief that Russell was shot with Garcia's gun. Appellant argues that from this evidence it can be inferred that Russell was shot first because (1) a single gunshot was heard first and (2) Boone noticed that Russell was shot within seconds of getting into the back seat of Tell's car where Garcia was sitting before the gun battle started.

However, ballistics evidence established that there were at least three guns involved in this shooting. The evidence supports an inference that one gun belonged to Garcia; it was still in Tell's vehicle when the police arrived. The other two guns could have belonged to appellant and Russell, to Tell and Russell, or to appellant and Tell. It is reasonable to infer from this evidence that one of the guns used was the Glock with the extended magazine that appears in the photo of Russell and Knight taken that afternoon on the trip from Louisiana to Dallas. The fact that at least one of the accomplices went to the drug transaction armed supports the jury's rejection of self-defense.

Additionally, the casings from one gun were primarily on the ground outside the driver's side of the Ford, with one inside the car on the rear driver's side. The casings from another gun were primarily on the ground outside the passenger side, with a few inside the car as well. Casings from the Glock found near Garcia were in the rear passenger seat, the front passenger seat, and on the ground outside the front passenger door. Medical evidence established that Garcia was shot primarily from the left while Tell was shot primarily from the right. Responding police officers found Tell dead in the driver's seat of the car while Garcia was fatally wounded in the back seat of the car. Viewed in the light most favorable to the verdict, this evidence shows that two people were firing into the car from the outside, while only one person was firing from inside the car. It is reasonable to infer that appellant and Russell each had a gun and each shot into the car, one from

the right and one from the left. It is also reasonable to infer that it was Garcia shooting from inside the car.

Photographs taken of Tell following the shooting show his phone is in his lap and his arms by his side. His body is bullet riddled. His shoes were not on his feet at the time, but on the floorboard. The jury could infer that this physical setting indicates that Tell thought this was going to be a normal drug transaction in which he had nothing to fear and was most probably either unarmed at the time appellant opened fire or disarmed almost immediately by appellant, who then used Tell's gun to kill Tell.

It is also reasonable to infer from the evidence that the two guns appellant took from the scene of the shooting and transported to Louisiana were the guns that he and his brother had used to shoot Tell and Garcia. The guns were never located, leading to yet another reasonable inference that appellant disposed of the guns[3] after he got back to Shreveport. Destruction of evidence is probative of guilt. *Martin v. State*, 151 S.W.3d 236, 244 n.6 (Tex. App.–Texarkana 2004, pet. ref'd); *Alex v. State*, No. 05-15-00539-CR, 2016 WL 4388021, at *4 (Tex. App. – Dallas August 17, 2016, no pet.) (not designated for publication).

Lastly, appellant fled the scene of the shooting. He told Boone to drive his brother to a hospital, but later they dropped him off with Knight at a gas station and drove back to Shreveport. Flight reflects consciousness of guilt, which a jury can consider in rejecting a self-defense claim. *See Valverde v. State*, 490 S.W.3d 526, 529 (Tex. App. – San Antonio 2016, pet. ref'd); *Kirk v. State*, 421 S.W.3d 772, 781 (Tex. App. – Fort Worth 2014, pet. ref'd) (referencing flight from the scene of a crime as evidence a jury could consider in rejecting a self-defense claim); *see also*

---

[3] The prosecutor argued, without objection, the following to the jury: "Those guns are at the bottom of a river."

*Clayton v. State*, 235 S.W.3d 772, 780 (Tex. Crim. App. 2007) (noting that a factfinder may draw an inference of guilt from the circumstance of flight).

Having reviewed all of the evidence in the light most favorable to the prosecution, we conclude the jury rationally found each element of the offense was proven beyond a reasonable doubt and rationally rejected appellant's self-defense claim. We overrule issues one and two.

### Murder in the Course of Robbery or Attempted Robbery

In his third issue on appeal appellant claims that the evidence was insufficient to prove he was in the course of committing or attempting to commit robbery when he shot Tell. We do not agree.

A challenge to the sufficiency of the evidence is evaluated under the well-established standards set forth in *Jackson v. Virginia*. We review the evidence in the light most favorable to the verdict and determine whether a rational jury could have found all the elements of the offense beyond a reasonable doubt. *Jackson*, 443 U.S. at 319; *Brooks*, 323 S.W.3d at 894-95. This standard of review for legal sufficiency is the same for both direct and circumstantial evidence. *Wise v. State*, 364 S.W.3d 900, 903 (Tex. Crim. App. 2012); *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007); *Burden v. State*, 55 S.W.3d 608, 613 (Tex. Crim. App. 2001).

We defer to the jury's credibility and weight determinations because the jury is the sole judge of the witnesses' credibility and the weight to be given their testimony. *See Jackson*, 443 U.S. at 319; *Brooks*, 323 S.W.3d at 898-99; *Haywood v. State*, 344 S.W.3d 454, 458-59 (Tex. App. – Dallas 2011, pet. ref'd). We will uphold the verdict unless a rational factfinder must have had reasonable doubt with respect to any essential element of the offense. *Jackson*, 443 U.S. at 319; *Brooks*, 323 S.W.3d at 899.

When the record supports conflicting inferences, we must presume that the factfinder resolved those conflicts in favor of the prosecution and defer to that determination. *Jackson*, 443

U.S. at 326; *Wise,* 364 S.W.3d at 903. The State need not disprove all reasonable alternative hypotheses that are inconsistent with appellant's guilt. *Wise*, 364 S.W.3d at 903. Rather, we consider only whether the inferences necessary to establish guilt are reasonable based upon the cumulative force of all the evidence when considered in the light most favorable to the verdict. *Hooper*, 214 S.W.3d at 13.

The indictment alleged capital murder, in part, on the basis that the murder occurred while appellant was in the course of committing and attempting to commit robbery. TEX. PENAL CODE § 19.03(a)(2). A person commits robbery if, in the course of committing theft and with intent to obtain or maintain control of the property, he intentionally, knowingly, or recklessly causes bodily injury to another or intentionally or knowingly threatens or places another in fear of imminent bodily injury or death. TEX. PENAL CODE § 29.02(a). A person commits theft if he unlawfully appropriates property with intent to deprive the owner of property. TEX. PENAL CODE § 31.03(a). "In the course of committing" refers to conduct occurring in an attempt to commit, during the commission of, or in the immediate flight after the attempt or commission of the murder. *McGee v. State*, 774 S.W.2d 229, 234 (Tex. Crim. App. 1989); *Dillard v. State*, 931 S.W.2d 689, 696 (Tex. App. – Dallas 1996, pet. ref'd). In order to prove the offense of capital murder wherein robbery or attempted robbery is alleged as the aggravating element, the State need not prove a completed robbery but must only show that an intent to rob was formed prior to or during the commission of the murder. *Maldonado v. State*, 998 S.W.2d 239, 243 (Tex. Crim. App. 1999); *Robertson v. State*, 871 S.W.2d 701, 705 (Tex. Crim. App. 1993). Intent to rob may be inferred from the facts. *McGee,* 774 S.W.2d at 235.

Appellant's challenge to the sufficiency of the evidence to prove that he acted while in the course of committing or attempting to commit robbery focuses on the theft, as opposed to the assaultive, requisites of robbery. Based on the evidence in this case, viewed in the light most

–16–

favorable to the verdict, it was reasonable for the jury to conclude beyond a reasonable doubt that appellant had formed the intent to obtain control of Tell's cocaine either before or during the murder.

Appellant, through Boone, set up a drug deal with Tell to buy 9 ounces of cocaine for $8,000. Although Boone saw appellant in possession of some money, he did not think it was a large amount; specifically, Boone never saw $8000, even though he was with appellant and the other two accomplices for several hours on the drive from Shreveport to Dallas and while waiting to meet up with Tell. The jury could have reasonably inferred that appellant did not have the $8,000 for the drug deal and that he intended to steal the drugs rather than buy them.

It is also significant that at least one of the accomplices went to the drug transaction armed. Russell, appellant's brother, was in possession of a Glock firearm with an extended magazine. The modifications to this weapon were designed to increase the "capacity" for bullets. The presence of this weapon furthers the inference that appellant never intended to purchase the drugs but rather to steal them and that appellant formed this intent prior to connecting with Tell.

Additionally, the drugs found in Tell's car did not equal the amount of cocaine appellant allegedly intended to purchase. A piece of what ultimately proved to be rock cocaine weighing 42.3 grams was found under Tell's body in the car. Cocaine in an amount of approximately 28.2 grams was found in Garcia's pocket at the hospital. These amounts in combination constitute approximately 70.5 grams, or 2.5 ounces, which is far short of the 9 ounces (approximately 255.2 grams) of cocaine Tell was supposed to sell to appellant and leaves a quantity of cocaine unaccounted for. The front driver's seat had cocaine residue, which could indicate that other cocaine had been present in the car but was removed. The jury could have reasonably inferred that appellant stole cocaine which was in plain view and was readily accessible but did not steal the cocaine which was not in plain view and was under Tell's seat and in Garcia's pocket.

When viewed in the light most favorable to the verdict, the evidence shows that appellant and his accomplices went to the drug deal armed and with the intent to steal the cocaine from Tell rather than pay the agreed price. Consequently, a rational jury could conclude from the evidence that appellant had formed the intent to rob before the murder and that he intentionally murdered Tell while in the course of committing or attempting to commit robbery. The evidence is legally sufficient to prove this allegation in the indictment. We overrule issue three.

### Robbery and Self-Defense

In his fourth issue on appeal, appellant claims that the trial court erred by failing in its jury instructions to apply the law of self-defense to robbery allegations in the indictment. We conclude that appellant was not entitled to this instruction.

In Count I of the indictment, appellant was charged with a single offense of capital murder under two alternative theories: (1) that appellant murdered Tell and also murdered Garcia during the same criminal transaction; and (2) that appellant murdered Tell in the course of committing or attempting to commit robbery. TEX. PENAL CODE § 19.03(a)(2) & (a)(7)(A). The charge applied the law of self-defense to the first theory, *i.e.,* that appellant had murdered Tell while also murdering Garcia during the same criminal transaction. The charge did not apply the law of self-defense to the second theory, *i.e.*, that appellant had murdered Tell in the course of committing or attempting to commit robbery.

Appellant did not object to the charge on the basis he now urges on appeal, nor did he request that the law of self-defense be applied to the robbery theory of capital murder. Consequently, appellant must first establish that there is error in the charge and second, if error is present, that he suffered egregious harm as a result of that error. *Middleton v. State*, 125 S.W.3d 450, 453 (Tex. Crim. App. 2003); *Almanza v. State*, 686 S.W.2d 157, 171-72 (Tex. Crim. App. 1985).

A person committing the offense of robbery, however, has no right of self-defense against his intended victim. *See Davis v. State*, 597 S.W.2d 358, 360 (Tex. Crim. App. 1980); *Dickson v. State*, 463 S.W.2d 20, 23 (Tex. Crim. App. 1971); *Dillard v. State*, 931 S.W.2d 689, 697 (Tex. App. – Dallas 1996, pet. ref'd). As a result, we conclude that appellant was not entitled to a jury instruction of self-defense to robbery at all. We overrule issue four.

## Jury Charge

In his fifth issue on appeal, appellant claims that the jury charge erroneously authorized a non-unanimous verdict which resulted in egregious error.

In Count I of the indictment, appellant was charged with a single offense of capital murder under two alternative theories: (1) that appellant murdered Tell and also murdered Garcia during the same criminal transaction and (2) that appellant murdered Tell in the course of committing or attempting to commit robbery. TEX. PENAL CODE § 19.03(a)(2) & (a)(7)(A). The jury charge authorized a single conviction for capital murder if the jury unanimously found beyond a reasonable doubt that appellant murdered Tell under either theory:

> Now, if you unanimously find from the evidence beyond a reasonable doubt that, on or about September 5th, 2013, in Dallas County, Texas, the defendant, PATRICK LYNN RUSSELL, either individually or as a party as that term has been defined:
>
> > did then and there intentionally or knowingly cause the death of an individual, namely, TAVARES TELL, by shooting TAVARES TELL with a firearm, and did then and there intentionally and knowingly cause the death of another individual, namely, KENNY GARCIA, by shooting KENNY GARCIA with a firearm, and both murders were committed during the same criminal transaction,
> >
> > OR,
> >
> > did then and there intentionally cause the death of an individual, namely, TAVARES TELL, by shooting TAVARES TELL with a firearm, and the defendant was then and there in the course of committing or attempting to commit the offense of robbery,

–19–

then you will find the defendant guilty of capital murder as charged in Count I of the indictment, and you will not render a verdict with respect to Count II.

Unless you so find, or if you have a reasonable doubt, you will find the defendant not guilty of capital murder under Count I, and you shall next consider Count II.

The jury returned a general verdict finding appellant guilty of capital murder as charged in Count I of the indictment.[4]

Texas law requires a unanimous jury verdict in all criminal cases. *See* TEX. CONST. art. V, § 13; TEX. CODE CRIM. PROC. art. 36.29(a); *Jefferson v. State*, 189 S.W.3d 305, 310-11 (Tex. Crim. App. 2006). A jury must unanimously agree that the defendant committed one specific crime in order to convict. *Landrian v. State*, 268 S.W.3d 532, 535 (Tex. Crim. App. 2008). The State may,

---

[4] There was some initial confusion as to exactly what the jury found because the jury foreman originally signed three verdict forms. The trial court judge stated that he has been handed the jury charge which contained the following verdicts:

> "We, the jury, unanimously find the Defendant guilty of capital murder as charged in Count 1 of the indictment." Signed by the foreperson.

> …[N]ext, this is on Page 22, says, "We, the jury, unanimously find the Defendant guilty of the murder of Kenny Garcia as included in Count 1 of the indictment," and there's a signature of the foreperson.

> And then on Page 23 it says, "We, the jury, unanimously find the Defendant guilty of the murder of Tavares Tell." And there is the foreperson's signature conforming to that verdict.

The trial court judge proposed bringing the jurors back in to the courtroom, asking them to clarify their verdict, and sending them back to the jury room to continue deliberations. Counsel for appellant objected to this proposal:

> Your Honor, as the charge is drafted as the jury has unanimously voted, the jury has found the Defendant had the right to self-defense against both of the victims in this case. And I'm asking the Court acquit – see that as a judgment of acquittal in this case and not send it back to them. It's a rejection – to me, it's a rejection of their verdict based on the clear wording of the charge.

The trial court overruled this objection. The court then brought the jury into the courtroom and ordered them to continue to deliberate to clarify their verdict.

The jury later clarified that its verdict was as follows: "We, the jury, unanimously find the Defendant guilty of capital murder as charged in Count 1 of the indictment." The trial court then polled the jury to ascertain that it was the verdict on which all twelve jurors agreed.

On appeal, appellant does not challenge the trial court's ruling on his objection, but rather claims that the charge did not mandate a unanimous verdict.

however, allege different methods of committing a single offense in an indictment. *Kitchens v. State*, 823 S.W.2d 256, 258 (Tex. Crim. App.1991) (indictment alleged two different methods of committing single offense of capital murder). When alternate theories of committing the same offense are alleged in the conjunctive in the indictment, as they were in this case, it is proper for the jury to be charged in the disjunctive. *Id*., at 258. A jury is not required to find unanimously that the defendant committed that crime in one specific manner or using the same specific means. *Landrian*, 268 S.W.3d at 535.

In homicide cases, which focus on the death of an individual, different legal theories involving the same victim are simply alternate methods of committing the same offense. *Huffman v. State*, 267 S.W.3d 902, 905 (Tex. Crim. App. 2008). In capital murder prosecutions a jury charge may properly instruct, in the disjunctive, different capital murder theories with respect to the same victim. *Davis v. State*, 313 S.W.3d 317, 342 (Tex. Crim. App. 2010); *Gamboa v. State*, 296 S.W.3d 574, 584 (Tex. Crim. App. 2009). The jury's verdict need not be unanimous on which of the underlying felonies the defendant was in the course of committing at the time of the homicide. *Gardner v. State*, 306 S.W.3d 274, 302 (Tex. Crim. App. 2009).

Here, the jury was instructed to find appellant guilty only if the jury unanimously found from the evidence beyond a reasonable doubt that, on or about September 5, 2013, appellant either (1) murdered Tell and also murdered Garcia during the same criminal transaction *or* (2) appellant murdered Tell in the course of committing or attempting to commit robbery. It was essential that the jury unanimously agree on the core element of capital murder, *i.e.,* that appellant had murdered Tell. It was not essential that the jury unanimously agree as to the specific manner and means of how appellant committed that murder.

The jury charge was not erroneous. Because the charge was not erroneous, no harm is attendant in the verdict. We overrule issue five.

## Conclusion

We overrule appellant's issues and affirm.

/Elizabeth Lang-Miers/
ELIZABETH LANG-MIERS
JUSTICE

Do Not Publish
TEX. R. APP. P. 47.2(b)

170124F.U05



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

PATRICK LYNN RUSSELL, Appellant

No. 05-17-00124-CR     V.

THE STATE OF TEXAS, Appellee

On Appeal from the 292nd Judicial District Court, Dallas County, Texas
Trial Court Cause No. F-1600779-V.
Opinion delivered by Justice Lang-Miers.
Justices Fillmore and Stoddart participating.

Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered this 24th day of January, 2018.